ESTATE OF JEROME K. GOLDSTEIN, Deceased, SYLVIA GOLDSTEIN, Executrix and Trustee, and SYLVIA GOLDSTEIN, personally, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Goldstein v. Commissioner
Docket No. 5179-73.
United States Tax Court
T.C. Memo 1976-19; 1976 Tax Ct. Memo LEXIS 381; 35 T.C.M. (CCH) 71; T.C.M. (RIA) 760019; January 27, 1976, Filed Aaron Z. Schomer and William N. Gurtman, for the petitioners. Gerald J. O'Toole, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a $7,696.74 deficiency in the Federal income tax of Jerome K. (now deceased) and Sylvia Goldstein for the taxable year 1968. The sole issue in controversy is whether petitioners' gain realized on the involuntary conversion of property in 1968 should have been recognized on their 1968 joint income tax return or whether such gain qualified for nonrecognition under section *382 1033. [1] Subsumed in this issue is the question whether Jerome held the condemned property individually or in partnership with his brother. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Jerome K. Goldstein died on April 3, 1973. His wife, Sylvia, was duly appointed executrix and trustee under his last will and testament and was a resident of Passaic, New Jersey, at the time she filed the petition herein. Jerome and Sylvia filed a joint income tax return for the taxable year 1968 with the district director of internal revenue, Newark, New Jersey. Sylvia is joined in this action personally by reason of her signing that return. Any reference herein to "petitioner" shall be to Sylvia in her representative as well as personal capacity. In 1919, Jerome's father, Max Goldstein, first acquired certain realty in the city of Passaic for the purpose of engaging in the business of retailing men's clothing and furnishings thereon. By 1954, the property and the business had passed into the hands of Jerome and his brother, Abraham. [2] Jerome *383 and Abraham operated as a partnership with Jerome holding a 95 percent interest and Abraham holding a five percent interest therein. In 1958, Jerome and Abraham formed the Max Goldstein & Sons corporation to operate the clothing business. The real estate on which the business was located remained in the partnership and the premises were leased to the corporation. Jerome and Abraham maintained the same proportionate interests in the corporation as they had in the partnership. In or about 1962, the City of Passaic Redevelopment Agency was created for the development of an urban renewal project. From media reports in 1962 and 1963, the brothers learned that their business site was within the zone of the planned renewal project and that such site would, therefore, be condemned. With condemnation imminent, Jerome and Abraham sought suitable property for the relocation of the clothing business. By mid-1964, a desirable site became available *384 in Passaic and Jerome entered into negotiations for its purchase. The cost of the property and the cost of alterations of the structure thereon to conform with the Goldstein corporation's business requirements aggregated from $125,000 to $150,000. Abraham did not want to assume his five percent proportionate share of such anticipated costs and decided not to join in the acquisition of the replacement property. The brothers agreed that when the old property was condemned, Abraham would take his share of the proceeds and thereafter just participate in the business of Max Goldstein & Sons corporation. During the course of negotiations for acquisition of the relocation site, Jerome informed his attorney that he wanted to utilize a corporation for the holding of the new property. Rather than form a new corporation, Jerome and his attorney decided to work with an existing entity, Kelsil, Inc., a New Jersey corporation organized in 1954, the stock of which was wholly-owned by Jerome. [3] At all times prior to the acquisition of the replacement property, Kelsil, Inc. was completely inactive; it had no assets or liabilities. *385 In October, 1964, Kelsil, Inc. contracted to purchase the relocation site. In December, 1964, the deed to the new property was delivered to Kelsil, Inc. and was duly recorded. Jerome furnished the funds to the corporation for the purchase, repair and improvement of the property. In November, 1965, Max Goldstein & Sons clothing business moved into the premises acquired by Kelsil, Inc. and has since occupied such premises and paid rent to Kelsil, Inc. On December 23, 1965, the area in which the old property was located was designated as "blighted" and in 1966 the Redevelopment Agency authorized the requisition of such property. On April 18, 1968, an offer of sale of the old property was made to the Redevelopment Agency and such document described the offerors as Jerome K. Goldstein and Sylvia Goldstein h/w, Jerome K. Goldstein t/a Max Goldstein & Sons, Abraham and Frances Goldstein h/w. Included in the body of the offer was the following: The said Abraham Goldstein and Frances Goldstein, h/w are joining in this contract solely for the purpose of conveying an unrecorded and equitable interest in said real estate. On May 24, 1968, the Redevelopment Agency issued a check for *386 $66,000 to the offerors for the land. The check was payable to and endorsed by Jerome K. Goldstein and Sylvia Goldstein and Abraham Goldstein and Frances Goldstein. The check was deposited into the partnership checking account of Max Goldstein & Sons. Also on May 24, 1968, the Goldsteins delivered the deed to the property to the Redevelopment Agency. The proceeds from the sale were eventually distributed from the partnership checking account to each of the brothers in proportion to their partnership interests. Max Goldstein & Sons partnership filed partnership income tax returns through the taxable year 1968, reporting Jerome and Abraham as the partners and the old property as the partnership asset. Depreciation was taken in respect of such property through 1968, and both brothers took their distributive shares of the partnership losses on their individual tax returns through 1968. In March of 1969, on behalf of the partnership, a request was filed with the district director of internal revenue, Newark, New Jersey, for an extension of time within which the partnership could reinvest the proceeds of the sale in like property. After submitting additional information to the district *387 director, including a statement that the old property was owned by the partnership, the extension was granted. The property purchased in 1964 was ultimately treated as the replacement property. In 1970, Abraham filed an amended income tax return for the taxable year 1968 in which he reported his five percent share of the proceeds realized from the sale of the old property to the Redevelopment Agency. ULTIMATE FINDING OF FACT The converted property was held by Jerome and Abraham, as partners, at the time it was involuntarily converted and at the time it was replaced with similar property. OPINION Petitioner's claim of nonrecognition treatment for gain realized upon the involuntary conversion of property turns upon the ownership of the property so converted and the nature of the election to replace such property. Section 1033(a)(3)(A). Respondent concedes that the other conditions of section 1033 for nonrecognition, involuntary conversion and timely replacement with property similar or related in use, have been met. Ownership
Both parties agree that until 1964 the old property was held by Jerome and Abraham as partners. [4] Petitioner takes the position that during the *388 1964 negotiations for a relocation site, Abraham sold his five percent partnership interest to Jerome in return for a promise of a future payment of five percent of the proceeds to be realized upon the condemnation of the partnership property, and that the partnership was thereby terminated prior to the acquisition of the new property. We disagree. That Abraham chose not to invest in new property with Jerome does not mean that their partnership in respect of the old property was terminated, absent an independent showing of a sale of Abraham's partnership interest. Petitioner's evidence in support of a sale of Abraham's partnership interest is unpersuasive. Abraham testified that in 1964 he orally transferred said interest to Jerome in return for a promise to pay five percent of the condemnation proceeds when received by Jerome. When probed *389 about the substance of the transfer, Abraham said he surrendered his "equity in the property." Other than the trust that may inhere in a fraternal relationship, no satisfactory explanation was offered as to why Abraham would have presently transferred something of value in return for a mere promise to pay an indefinite sum at an indefinite date in the future. Petitioner attempted to bolster Abraham's testimony with the testimony of Jerome's attorney that Jerome told him he had purchased Abraham's interest in 1964. This testimony came, however, only after repeated prodding by the Court and repeated hesitation by the witness. Finally, petitioner argues that the description of the owners of the condemned property in the 1968 offer of sale to the Redevelopment Agency as well as the description of Abraham's property interest therein support a finding of a 1964 sale. At best, this language suggests that the brothers were unclear as to their legal relationship. [5] The abundance of other evidence overcomes any awkward language in the offer of sale, as well as any inferences we are asked to draw concerning the informality and trust with which family transactions are commonly conducted. *390 The purported sale agreement was never reduced to writing, notwithstanding that previous intra-family transfers of partnership interests had been formalized in written documents. Although an interest in land allegedly passed, no deed was given and no change in record title was made. After 1964, the partnership continued to report income on partnership returns. The partners continued to take depreciation in respect of partnership property (the old site) and to take their distributive shares of partnership losses through 1968. After the transfer of the condemned property to the Redevelopment Agency, Jerome and Abraham represented to the district director of internal revenue that their partnership continued to exist when they filed for an extension of time in which the partnership might replace the converted property. The condemnation proceeds, which took the form of a check payable to Jerome and Abraham and their spouses, were deposited into the partnership bank account upon receipt in 1968. The 1970 distribution to Abraham was made from the partnership account and not from Jerome directly. [6]
*391 While none of these factors is alone determinative, we think that together they establish the continuance of a partnership relationship well after the purported 1964 transaction. Mihran Demirjian,54 T.C. 1691 (1970), affd. 457 F.2d 1 (3d Cir. 1972). Therefore, the old property was held by the partnership at the time condemnation became imminent, at the time the property was replaced and at the time the property was ultimately sold. Election to Replace
In view of our determination that the converted property was held by a partnership, this case falls squarely within the holding of Mihran Demirjian,supra, wherein we held that an election to replace involuntarily converted property held by a partnership must be made by the partnership, and not by the partners individually, in order to obtain the benefits of section 1033. [7] Since the partnership of Jerome and Abraham did not elect to replace the converted property, Jerome is not entitled to nonrecognition of the gain he realized upon sale of the partnership property to the Redevelopment Agency because of his reinvestment in a whollyowned corporation acquiring replacement property. *392 [8]
*393 Decision will be entered for the respondent.
Footnotes
1. All section references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. From 1919 until 1939, the business and the property were owned entirely by Max. From 1939 until 1954, the business and the property were owned in varying proportions by family members including Max, Ida, Fred, Jerome, and Abraham Goldstein.↩
3. Two shares of stock, however, were nominally held by others for the purpose of complying with applicable New Jersey corporate law.↩
4. Petitioner does not argue (and indeed on the record made herein we think it would be impossible to do so) that such property was held by Jerome and Abraham as tenants in common. See Thomas K. McManus, 65 T.C. - (Oct. 30, 1975); Mihran Demirjian,54 T.C. 1691 (1970), affd. 457 F.2d 1↩ (3d Cir. 1972).
5. We note that in such offer Abraham represents that he is conveying an unrecorded equitable interest in the realty. Yet at trial, Abraham testified he previously parted with his equity in the property.↩
6. In view of the foregoing, it becomes increasingly difficult to perceive what Abraham might have transferred in 1964. Abraham clearly did not transfer his right to partnership income. The partnership had no taxable gain between 1964 and 1968 but Abraham continued to enjoy the tax benefit of his distributive share of the partnership losses after 1964 and it can be fairly inferred that had the partnership produced taxable income, Abraham would have continued to enjoy his proportionate share thereof as well. Similarly, the sum of the evidence shows that Abraham did not transfer his capital interest. Abraham ultimately received the same amount from the same source as he would have received had there been no "agreement" in 1964 with his brother. Abraham "sold nothing of taxable consequence, neither the 'tree' nor the 'fruit'"; if he parted with anything, whatever it was he parted with had "no economic significance" since Abraham "retained the entire economic substance" of his partnership interest. See Lester William Roth,38 T.C. 171, 174 (1962), affd. 321 F.2d 607↩ (9th Cir. 1963).
7. Petitioner would have us distinguish this case from Mihran Demirjian,supra, since Demirjian involved two partners with equal partnership interests whereas Jerome and Abraham had 95 and 5 percent respective partnership interests. We fail to see the basis for any such distinction. The Demirjian case simply deals with the type of section 1033 election any partnership must make. See Sec. 703(b). That the partnership shares were disparate does not detract from the fact of partnership. We also note that aside from the substantive view that we took in Demirjian, and reassert herein, an appeal in this case will be to the Third Circuit Court of Appeals which also adheres to such view. See Jack E. Golsen,54 T.C. 742 (1970), affirmed on the substantive issue 445 F.2d 985↩ (10th Cir. 1971). 8. Because of our reasoning herein, we need not consider petitioner's contention that Jerome owned the condemned property individually and that the acquisition of the relocation site by Kelsil, Inc., his wholly-owned corporation, satisfied the requirements of section 1033. We note however that it is far from clear on the record herein that the money which passed from petitioner to Kelsil, Inc. represented the purchase price for stock as against "advances." Compare Adolph K. Feinberg,45 T.C. 635 (1966), affd. 377 F.2d 21 (8th Cir. 1967), with John Richard Corp.,46 T.C. 41↩ (1966).