ADOLPH K. FEINBERG AND VIRGINIA B. FEINBERG, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4240–63. Filed March 31, 1966.

*Norman Barken* and *Henry Lowenhaupt,* for the petitioners.
*Glenn L. Strong,* for the respondent.

FORRESTER, *Judge:* The respondent determined deficiencies in petitioners' income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1957 | $9,207.53 |
| 1959 | 19,138.99 |

Some of the issues have been conceded by the petitioners, leaving for our decision the following: (1) Did the petitioners, for the purpose of replacing condemned property, invest proceeds received therefrom in five other properties "similar or related in service or use"; (2) was one of such five other properties in fact purchased by the petitioners; and (3) were three of such other properties purchased timely within the meaning of section 1033 (a) (3) (B) of the Code? [1]

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

Petitioners Adolph K. Feinberg and Virginia B. Feinberg, husband and wife, filed joint Federal income tax returns for the years 1957 and 1959 on the cash method of accounting with the district director of internal revenue, St. Louis, Mo. Virginia B. Feinberg is a party to this proceeding only because she signed the joint returns in issue, and Adolph K. Feinberg is hereinafter sometimes referred to as the petitioner.

Petitioner has been in the real estate business since 1920.

In September of 1951, the petitioner acquired a 56-acre tract of real estate adjacent to the St. Louis Municipal Airport, which tract was unimproved except for billboards and lights. This property is hereinafter referred to as the airport property. He acquired and held the airport property as an investment with the hope that this land would increase in value.

The parties have stipulated that, prior to October 10, 1953, portions of the airport property were placed under threat of condemnation by two duly constituted governmental authorities, the City of St. Louis, in connection with a program to expand its municipal airport, and the State of Missouri in connection with a highway construction program.

In May 1954, condemnation commissioners were appointed by the Circuit Court of St. Louis County, pursuant to the law of Missouri. These commissioners, *inter alia*, returned an award of $101,500 for the taking of the airport property by the City of St. Louis and such amount was, by said city, paid into the registry of that court on or about December 3, 1956. Further proceedings were had which finally resulted in a total of $119,000 in awards being paid into the registry

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

of the court before July 24, 1957, and on that date and on July 22, 1957, petitioner made applications and the presiding judge of such court made orders thereunder that the clerk of the court pay petitioner a total of $119,000. On January 1, 1957, the petitioners' basis in the airport property for income tax purposes was $31,325.01.

Shortly after July 2, 1957, petitioner appealed the condemnation matter to the Supreme Court of the State of Missouri. As a result of such appeal additional compensation was awarded from the City of St. Louis in the amount of $88,500, which additional amount petitioner received on or about October 27, 1959.

The petitioner had first heard of the plans to condemn the airport property in 1951 when a bill was passed by the board of aldermen of St. Louis. After hearing this the petitioner started to think of reinvesting any condemnation proceeds in other real property, and he now contends that the five properties set out hereinafter were so acquired by him.

On or about October 15, 1953, property located at 120 N. Broadway was sold to Olive M. Gutweiler, the sister-in-law of the petitioner. She purchased this property with funds supplied by the petitioner, who thus became the true owner of the property. Olive M. Gutweiler was a straw party.

The property was a corner lot, improved by a two-story building, and located in the business district of St. Louis. At the time of petitioner's acquisition this property was used by the First National Bank of St. Louis to house its personal loan department. The lease ended in 1955, and it was not renewed. The building stood vacant for 3 years, and the petitioner then demolished it.

On October 8, 1954, the petitioner's cost in this property was $90,992.61. From that time until the end of 1956, the petitioner's cost was reduced by $10,942.37, representing numerous items properly reducing cost. During this same period the petitioner incurred expenses on this property of $9,821.57 for interest, insurance, advertising, window cleaning, postage, and repairs.

The land at 120 N. Broadway was assessed for more than the building, and petitioner bought this property primarily because he thought the value of the land would increase. At the time of the purchase there was conjecture about building the now famous Arch and a new sports stadium in the immediate area. By the time of the trial herein the St. Louis Arch, a $30-million project, and the new athletic stadium costing $89 million, were nearing completion.

The petitioner owned all of the stock of the A. K. Feinberg Real Estate Co. He advanced funds to the corporation to enable it to purchase improved land at 4005–07 Chouteau. This corner lot was located on an important St. Louis intersection, the corner of Vandeventer and Chouteau. This property was purchased on March 12, 1957, for

$10,250, and was acquired because petitioner thought the land, which was assessed at five times the value of the vacant building which "improved" it, was a good investment.

On June 15, 1959, Olive M. Gutweiler acquired title, as a straw party, to property at 5240 Labadie. On June 17, 1959, she executed a general warranty deed to this property in favor of Real Estate Supervising Co., Inc., a corporation wholly owned by the petitioner. The cost of this property, which was used thereafter as a parking lot, was $7,500.

On December 28, 1959, Olive M. Gutweiler as a straw party for petitioner took title to property improved by a hamburger stand at 1216 Olive St. The purchase price of this property was $25,000, and petitioner later sold it to the Missouri Pacific Railroad Co.

On June 20, 1960, Olive M. Gutweiler entered into a contract to purchase property at 114–116 N. Broadway in St. Louis. The contract referred to a total purchase price of $30,000. On July 10, 1961, Olive M. Gutweiler took the title to this property as a straw party for the petitioner.

This property was improved with a two-story building, the first floor of which was used as a tavern and was rented during 1960 and 1961. The second floor was vacant during both years.

During 1957 both the City of St. Louis and the State of Missouri were actively working on the airport property. On May 16, 1957, at the request of the State Highway Commission employees of the City of St. Louis began staking a part of the airport property preparatory to the dumping of surplus dirt by the State Highway Department. Later that year on August 29 the highway department began dumping what eventually amounted to 600,000 cubic yards of dirt on the property. Also during August of 1957 the City of St. Louis began dumping unneeded broken concrete on part of the airport property.

The petitioners did not report the $119,000 received from the condemnation in 1957 on their Federal individual income tax return for that year. The petitioner also failed to report the $88,500 received in 1959 in their individual return for that year. In neither year did the petitioner make an affirmative election regarding nonrecognition of the gain under section 1033 (a) of the 1954 Code. The petitioner's income tax returns for those years, and for 1958, were prepared by a certified public accountant.

The petitioners signed their original 1958 individual income tax return on February 21, 1959. They reported on Schedule D of this return, the $119,000 received in 1957, resulting in a gain of $73,082.98. On this return they also reported and claimed a demolition loss of $74,310.17 on the building which improved the 120 N. Broadway property, computing such loss on petitioners' total cost rather than on a basis reduced by a nonrecognition gain, as required by section

1033. Their amended return for 1958 was signed on April 12, 1962, shortly after respondent had completed examination of petitioners' income tax returns for 1957, 1958, 1959, and 1960. It made no reference to the condemnation proceeds or gain on the airport property, but made no change as to the claimed demolition loss.

The petitioner never requested an extension of time to reinvest any proceeds from the condemnation award.

OPINION

Preliminarily we will dispose of questions relating to the property located at 4005–07 Chouteau. Petitioner simply assumes on brief that he personally purchased this property as "replacement" property in 1957, but the record does not bear him out, and we have found otherwise.

Olive M. Gutweiler took record title to this property by a general warranty deed dated and recorded on March 12, 1957, and the record herein is silent as to any formal transfer from her thereafter. It is obvious from the record that Gutweiler was acting as a straw; but as a straw for whom? She testified in a general fashion that she often acted as a straw for petitioner, who is her brother-in-law, and that she always executed further deeds to him; but on cross-examination there was admitted into evidence the warranty deed by which she had conveyed the 5240 Labadie property to Real Estate Supervising Co., Inc., on June 17, 1959, and she then admitted that, being a straw, it was "none of my business" who got the titles from her and that of her own knowledge she could not say for certain.

Additionally, we do not know who paid expenses, if any, on the Chouteau property in 1957 and 1958 while it stood vacant, but it was rented in 1959 and 1960. Income from this property was reported on the corporate return of A. K. Feinberg Real Estate Co. for 1960 and petitioner testified that it was probably reported in the same manner in 1959.

Section 1033(a)(3)(A) provides in pertinent part: "If the taxpayer * * *, for the purpose of replacing [condemned] property, * * * purchases other property * * *." Petitioner testified that he advanced money to A. K. Feinberg Real Estate Co. to enable it to purchase the Chouteau property, but this by no means fulfills the statutory requirement that petitioner purchase the property. *Higgins* v. *Smith*, 308 U.S. 473 (1940).

Although petitioner owned 100 percent of the stock of A. K. Feinberg Real Estate Co., he has not argued that such circumstance brings the Chouteau property within the purview of that portion of section 1033(a)(3)(A) which provides: "If the taxpayer * * * purchases stock in the acquisition of control of a corporation owning such other property, * * *." We observe that such argument would be unavail-

ing. Rev. Rul. 56–636, 1956–2 C.B. 522; also cf. Rev. Rul. 57–154, 1957–1 C.B 262, and Rev. Rul. 55–351, 1955–1 C.B. 343.

The property at 5240 Labadie is also probably disqualified as "replacement" property by reason of its having been purchased by Real Estate Supervising Co., Inc., rather than by petitioner, but since it was clearly purchased out of time, we decide as to this property on that basis.

Turning now to the alleged "replacement" properties located at 5240 Labadie, 1216 Olive, and 116 N. Broadway, we see that the respective purchase dates were June 15, 1959, December 28, 1959, and not earlier than June 20, 1960. Section 1033(a)(3)(B) provides that the condemned property must be replaced no later than "one year after the close of the first taxable year in which any part of the gain upon the conversion is realized." Determining when gain is realized requires reference to section 1001 of the Code.[2] In general terms the section provides that gain is realized when the taxpayer receives money and/or property from the sale or disposition, which is in excess of his adjusted basis in the property sold or disposed of.

In July of 1957, the petitioners received $119,000 from the registry of the court because of the condemnation of the airport property. This sum greatly exceeded their basis in the property of $31,325.01. Thus the petitioners realized a gain on their property during 1957 even though a greater award was made in a later year. Cf. *Estate of Jacob Resler*, 17 T.C. 1085 (1952).

It is of course settled that a condemnation proceeding is treated as a "sale" for income tax purposes. *Hawaiian Gas Products* v. *Commissioner*, 126 F. 2d 4 (C.A. 9, 1942), affirming 43 B.T.A. 655, certiorari denied 317 U.S. 653. As a general rule in ordinary real estate transactions, the sale occurs no later than the vesting of title and possession or the right to immediate possession in the purchaser. In condemnation suits the courts have generally held that the sale occurs upon the order of the court, or other action, which vests title in the condemning authority and creates an obligation to pay just compensation, even though the fair market value of the property is determined and paid at a later date.[3] See *Wendell* v. *Commissioner*, 326 F. 2d 600 (C.A. 2, 1964), affirming 39 T.C. 809 (1963); *Driscoll Bros. & Company* v. *United States*, 221 F. Supp. 603; *Wood Harmon*

---

[2] SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, * * *

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *

[3] Many of the cases from other jurisdictions which decide when a "sale" occurs in a condemnation proceeding do not rely on the time the condemning authority acquires his right to possession of the property. However, we note that under the law of St. Louis

*Corporation* v. *United States*, 206 F. Supp. 773 (S.D.N.Y. 1963), af-firmed on other grounds 311 F. 2d 918 (C.A. 2, 1963) ; *Dwight* v. *United States*, 225 F. Supp. 933 (N.D.N.Y. 1963).

State and local law determine when title vests in the condemning authority. The airport property was condemned by both the Missouri State Highway Commission and the City of St. Louis. Fortunately there is uniformity on this question in the applicable State and municipal law. See *State* v. *Oakley*, 354 Mo. 124, 188 S.W. 2d 820 (1945). In the *Oakley* case the court stated the applicable rule as follows, at page 821: "title to private property is fully acquired by the condemnor when it pays to the owner, or into court for him, the amount of damages awarded by commissioners legally appointed, although the judgment does not become final and appealable until all exceptions are determined and the commissioners' report finally approved." In the instant case it is apparent that title to the airport property vested in the condemning authorities late in 1956 when the first awards were paid into court. At that time the only avenues of dispute remaining open to petitioner concerned the size of the awards. It is irrelevant that the petitioners executed the deed to the land on October 19, 1959.

Our reading of section 1033(a)(3)(B) together with section 1001 persuades us that on this record the petitioners realized at least part of the gain in question no later than July 1957, when they received $119,000 from the registry of the court. The time for reinvestment thus expired on December 31, 1958. Since the three properties in question were purchased subsequent to this, they do not qualify as replacement properties.

The petitioner did not exercise his right to apply for an extension of time for reinvestment under section 1033(a)(3)(B)(ii) and he has given us no reason for this failure, either at the trial or on brief.

This leaves for our consideration only the property located at 120 N. Broadway. Petitioner purchased this property in October 1953, which was after the threat of condemnation of the airport property arose, but section 1033 does far more than simply limit the period of time within which condemned property must be replaced in order to achieve nonrecognition of gain.

The scheme of the statute where condemned property is replaced (paid for) by unlike property (money), is that the taxpayer, during the specified period of time, has the option to elect to replace the property condemned with property of like character and thus prevent the happening of a taxable event. The pertinent Code language is

and Missouri, the condemning authority has the right to take possession of the condemned property upon payment of the award into the registry of the court. *City of St. Louis* v. *Senter Commission Co.*, 343 Mo. 1075, 124 S.W. 2d 1180 (1938). In the instant case the condemning authorities took possession of and actively improved the airport property during 1957.

(section 1033(a)(3)(A)): "Nonrecognition of Gain.—If the taxpayer, * * * *for the purpose of* replacing the property so converted, *purchases* other [similar] property * * * [then], *at the election of* the taxpayer [recognition of] the gain shall be [deferred]." (Emphasis supplied.) The regulation (sec. 1.1033(a)–2(c), Income Tax Regs.) tracks the statute.

Section 1033 and the applicable regulation (sec. 1.1033(c)–1, Income Tax Regs.) then provide for a reduction in basis of the "replacement" property so that the gain will not escape untaxed, but will only await the eventual disposition of the replacement property.

Thus petitioner, at the outset, has the burden of proving that he elected to purchase 120 N. Broadway in order to replace his condemned property, and so defer tax on his gain. This involves his intent as regards such purchase, but we think that this subjective element is amply proved by the record facts.

Petitioner returned none of his gain in 1957, when it was in fact realized, and section 1.1033(a)–2(c)(2), Income Tax Regs., would seem to designate such failure as an election of nonrecognition. However, petitioner has always maintained that this gain was not includable in his income until 1958, and he did return it in full in that year. Incidentally, 1958 is also the year in which he claimed a demolition loss on 120 N. Broadway which more than offset the gain.

This action certainly does not aid petitioner's asserted intent of election not to recognize gain, and this is especially so when we consider that petitioner did not reduce his base in the alleged replacement property as is required by law when nonrecognition is in fact elected.

Petitioner's amended 1958 return, filed in April 1962, and after his returns for 1957 through 1960 had been examined by respondent, does not help his case. The obvious intendment of the statute is that petitioner must have the requisite intent during the specified period of time. He cannot (retroactively) simply pick out some property which he happened to purchase within the prescribed period and say "I chose this one!"

Further, the amended 1958 return, although omitting the condemnation gain, still failed to reduce the base of the alleged replacement property.[4]

Still further, when being questioned concerning this gain by a revenue agent during the examination of his 1957 through 1960 returns, petitioner first came up with a list of 3 properties, and later with a list

---

[4] Petitioner's position thus gives him effective double mileage on the airport gain; nonrecognition for now, and complete forgiveness for later, because the base in 120 N. Broadway was used up by the demolition loss.

of 13 properties which he represented to be the replacement properties for the airport gain. He has finally settled upon the 5 now in issue.

We think that all of the above affirmatively demonstrates that petitioner did not elect, or intend, to replace his airport property by his purchase of 120 N. Broadway, and we so hold.

*Decision will be entered under Rule 50.*