J. CARL HILL AND MARY E. HILL, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1206-73.    Filed July 14, 1976.

*Walter W. Woodside,* for the petitioners.
*Howard L. Williams,* for the respondent.

WILES, *Judge:* Respondent determined a $9,423.51 deficiency in petitioners' 1969 income taxes. There are two issues: (1) Whether petitioners are entitled to benefit from the nonrecognition provisions of section 1033;[1] and (2) whether the basis of the property sold under threat of condemnation is more than that allowed in the statutory notice of deficiency and used in determining gain.

---

[1] Statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

### FINDINGS OF FACT

Some facts were stipulated and are found accordingly.

Petitioners lived in Woodbridge, Va., when they timely filed their joint 1969 income tax return and when they filed their petition in this case.

In 1960, petitioners purchased property known as Sweden Point Marina, located in Charles County, Md., from Charles M. and Ina E. Upham. Sweden Point, a resort property, operated primarily in the summer and contained a restaurant and a marina. The property was subject to a first deed of trust of $33,375 in favor of Charles and Ina Upham.

After the acquisition of Sweden Point in 1960, petitioners at all times leased the restaurant, and periodically leased the marina, to Sweden Point Marina, Inc., a corporation whose stock was owned by J. Carl Hill's brother.

In December of 1962, petitioners gave a second deed of trust to A.M. Tolkins and Ruth Freiman as trustees for the benefit of Roy S. Thurman. The second deed of trust secured petitioners' indebtedness to Thurman of $26,000.

In February of 1963, petitioners entered into a written agreement for the sale of Sweden Point to Sam Christopher, providing in part that Christopher was to assume payments on the indebtedness secured by the first and second deeds of trust. Settlement, however, was delayed until February of 1964. At settlement, Christopher was in default of the payments on the second deed of trust. Further, checks delivered to the settlement attorney as payment for the property were drawn on insufficient funds. Accordingly, the premises were not conveyed.

While Christopher was in possession of Sweden Point, General Equipment Sales & Distributing Co., Inc., made improvements for which it received a promissory note. Subsequently, the promissory note was assigned to First National Bank of Washington (hereinafter First National).

After Christopher defaulted on the payments secured by the second deed of trust, the trustees instituted foreclosure proceedings. On May 19, 1964, Sweden Point was sold at public auction to B. Calvin Burns. The deed transferring title states that Burns paid $36,000, and acquired the property subject to a first deed of trust for the benefit of Charles and Ina Upham.

After expenses of sale and payment of the second deed of trust, there remained $14,336.90. As holder of the promissory note used to finance improvements at Sweden Point, First National filed a claim in the Circuit Court for Charles County, Md., to obtain the remaining proceeds. In their response to First National's claim, J. Carl and Mary E. Hill's reply brief stated: "A Partial Audit filed with the Court shows $14,336.90 of the sale proceeds to be distributable after expenses of sale and payment of 2nd and 3rd deeds of trust." [2]

First National's claim was disallowed in a final audit, which a court-appointed special auditor filed on June 16, 1966. On June 28, 1966, First National filed an exception to the final audit contending the special auditor erred in disallowing the claim. Trial was scheduled for a hearing on the matter, but prior to trial First National and petitioners reached a settlement. Consequently, First National's claim was dismissed with prejudice, the special auditor's report was ratified, and the remaining funds, $14,336.90, were distributed to petitioners as owners of the property prior to foreclosure.

On April 15, 1967, Burns and his wife, Carole M. Burns, by quitclaim deed, conveyed Sweden Point to petitioners. Petitioners acquired Sweden Point subject to a first deed of trust in the amount of $33,375, for the benefit of Charles and Ina Upham.

On March 20, 1969, petitioners sold Sweden Point under threat of condemnation to the State of Maryland for $100,000. Part of the proceeds of the sale was used to satisfy various debts secured by the property, including $5,268 paid to First National in satisfaction of a deed of trust. Petitioners elected not to recognize gain on their jointly filed 1969 income tax return.

After the condemnation, Dumfries Marine Sales, Inc. (hereinafter Dumfries), a Virginia corporation, purchased a barge on which it built the Pilot House Restaurant. Dumfries was solely owned by petitioner J. Carl Hill who acquired exclusive ownership in 1967. Pilot House Restaurant was leased by Dumfries to petitioner Mary E. Hill and petitioners' son, Donald C. Hill, both of whom did business as Pilot House Restaurant Partnership. The lease agreement required Pilot House

---

[2] This is the only reference made by any of the parties to a third deed of trust. As such it remains unexplained.

Restaurant Partnership to pay Dumfries $1,000 per month for the right to operate the restaurant.

Although Dumfries was technically dissolved on June 1, 1967, for failure to file annual reports and failure to pay annual registration fees and franchise taxes, it continued to conduct business activities. In addition to constructing and leasing Pilot House Restaurant, J. Carl Hill, as Dumfries' president, filed an income tax return for 1970 reporting income from its leasing activities; during 1970 and 1971 Dumfries on three occasions mortgaged property to obtain loans and signed promissory notes; and in 1973 Dumfries sold the Pilot House Restaurant property.

## OPINION

The first issue is whether petitioners may benefit from the nonrecognition provisions of section 1033. Generally, if a taxpayer sells property under threat of condemnation, section 1033 provides for the nonrecognition of gain to the extent that taxpayer, within a limited period of time, uses the proceeds of the sale to purchase other property similar or related in service or use.

Petitioners contend that the $100,000 received from the sale of Sweden Point, a restaurant-marina, was reinvested in Pilot House Restaurant, also a restaurant-marina, and consequently section 1033 should apply to any gain realized. In making this argument petitioners disregard their wholly owned corporation, Dumfries Marine Sales, Inc., that purchased a barge and constructed Pilot House Restaurant. Section 1033(a)(3)(A) provides for nonrecognition only "If the taxpayer * * *, for the purpose of replacing the [condemned] property * * *, purchases other property similar or related in service." There is no provision that grants nonrecognition in the event similar property is purchased by taxpayer's wholly owned corporation. Indeed, in *Adolph K. Feinberg,* 45 T.C. 635, 639 (1966), affd. 377 F.2d 21 (8th Cir. 1967), this Court specifically noted that even though taxpayer advanced money to his wholly owned corporation to enable it to purchase property, "this by no means fulfills the statutory requirement that petitioner purchase the property."

Petitioners seek to distinguish *Feinberg* by arguing that Dumfries was involuntarily dissolved in 1967, and therefore could not have purchased Pilot House Restaurant in 1969.

For Federal income tax purposes, the annulment of a corporation's charter does not necessarily have the effect of discontinuing the corporate entity. *J. Ungar, Inc.,* 26 T.C. 331, 341-342 (1956), affd. 244 F.2d 90 (2d Cir. 1957); *Donald L. Schuerholz,* T.C. Memo. 1976-163. If a corporation retains assets, even though under State law its legal existence has been terminated and the corporation is in the process of liquidation, it will be treated as a continuing taxable entity. *Sidney Messer,* 52 T.C. 440, 448 (1969), affd. 438 F.2d 774 (3d Cir. 1971). Further, even though the corporation is in the process of liquidation, if the corporation's affairs are substantially unsettled, it will remain in existence for Federal income tax purposes. *Hersloff v. United States,* 159 Ct. Cl. 366, 371-372, 310 F.2d 947, 950-951 (1962). Although there is no precise minimal standard for continued corporate existence, the purchase or sale of assets, the presence of corporate debts, and the distribution of moneys suggest that a corporation is continuing as a taxable entity. *Hersloff v. United States, supra.*

The record indicates that Dumfries' activities after its involuntary dissolution were anything but settled. Dumfries, under written agreement, leased Pilot House Restaurant to Pilot House Restaurant Partnership and received rent therefor; filed its Federal income tax return for 1970, reporting rental income; mortgaged property on three occasions to secure loans; and sold Pilot House Restaurant in 1973. In addition to these substantial activities there is no indication in the record that Dumfries was in the process of winding up its affairs, intended to distribute its assets, or adopted a plan of liquidation. Indeed, petitioner J. Carl Hill's act of filing a 1970 income tax return for Dumfries as its president contradicts his testimony that Dumfries ceased to exist in 1967, since only a "corporation in existence during any portion of a taxable year is required to make a return." Sec. 1.6012-2(a)(2), Income Tax Regs. Petitioners cannot carry on such extensive business activities in a corporate form and expect that form to be disregarded for Federal income tax purposes. *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943); *William B. Strong,* 66 T.C. 12 (1976). Therefore, we find no merit in petitioners' argument that Dumfries ceased to exist in 1967.

Since, for Federal income tax purposes, Dumfries was in existence in 1969, it rather than petitioners must be regarded as

the purchaser and owner of Pilot House Restaurant. Under the rule articulated in *Feinberg,* petitioners failed to replace the involuntarily converted property, and therefore, they must recognize any gain on the sale.

Gain on the sale of property is the excess of the amount realized over the adjusted basis. Sec. 1001(a). It is undisputed that petitioners realized $100,000 on the sale of Sweden Point to the State of Maryland. The second issue, therefore, is whether petitioners' adjusted basis at the time of sale exceeded $33,375, the amount allowed by the respondent.

Adjusted basis, for the purpose of determining gain or loss upon the sale of property, is the taxpayer's basis (in this case determined under section 1012)[3] as adjusted by section 1016 and the Income Tax Regulations thereunder.[4] Included in basis is the amount of any mortgages or liens to which the property is subject, whether or not assumed by the purchaser. *Parker v. Delaney,* 186 F.2d 455 (1st Cir. 1950). Accord, *Crane v. Commissioner,* 331 U.S. 1 (1947).

Petitioners contend their adjusted basis in Sweden Point at the time of sale was $60,473.89. Petitioners arrive at this figure by alleging they purchased Sweden Point from Burns subject to a first deed of trust for the benefit of Ina and Charles Upham in the amount of $33,375; subject to a second deed of trust for the benefit of Roy S. Thurman in the amount of $16,205.89;[5] and subject to a mechanics' lien in the amount of $5,268 resulting from improvements initiated by Sam Christopher. This lien was represented by a promissory note held by First National as assignee. Finally, petitioners contend that after they reacquired Sweden Point from Burns they built an 80-foot by 30-foot porch costing $5,250.[6]

In contrast to petitioners' contention, respondent argues that the adjusted basis of Sweden Point is limited to $33,375, the amount of the first deed of trust.

---

[3] Sec. 1012 reads in part: "The basis of property shall be the cost of such property."

[4] Sec. 1016(a)(1) reads in part: "Proper adjustment in respect of the property shall in all cases be made * * * for expenditures * * * properly chargeable to capital account." Sec. 1.1016-2(a), Income Tax Regs., states that expenditures properly chargeable to capital account include "the cost of improvements and betterments made to property."

[5] On brief petitioners explain that $16,205.89 represents the unpaid portion of the $26,000 loan from Roy S. Thurman.

[6] Petitioners fail to explain the discrepancy between $60,098.89, the sum of the amounts represented by the first deed of trust, second deed of trust, mechanics' lien, and porch construction, and the alleged adjusted basis of $60,473.89.

After considering petitioners' and respondent's arguments, we conclude the petitioners' adjusted basis in the Sweden Point property immediately prior to sale to the State of Maryland was $33,375.

The first item in dispute is the second deed of trust. Petitioners first acquired Sweden Point in 1960. Because payments were not made on a second deed of trust, a foreclosure proceeding was instituted. At the foreclosure sale, B. Calvin Burns paid $36,000 and acquired Sweden Point subject to the first deed of trust. Upon ratification of the sale, petitioners received $14,336.90, the remaining proceeds of the sale. Subsequently, petitioners repurchased Sweden Point from Burns and his wife. In contention is whether petitioners repurchased the property subject to a second deed of trust.

Under Maryland law petitioners were not entitled to have any proceeds of the sale distributed to them until after payment to the mortgagee of his claim and expenses.[7] Since Burns paid $36,000 at the sale and petitioners received $14,336.90 as surplus of the sale, it must be assumed that Maryland law was complied with and $21,663.10, the difference between the amount paid by Burns and the amount of surplus received by petitioners, was used to satisfy debts on the property, including the second deed of trust.

In addition to the requirements of Maryland law, the deed transferring title in Sweden Point to Burns states that Burns paid $36,000 at the foreclosure sale, acquiring the Sweden Point property subject to a first deed of trust. No indication is present on the face of the deed that Burns acquired the property subject to a second deed of trust. Finally, petitioners when before the Circuit Court for Charles County, Md., contesting First National's claim to the surplus from the foreclosure sale stated in their reply brief, "A Partial Audit filed with the Court shows $14,336.90 of the sale proceeds to be distributable, after expenses of sale and payment of 2nd and 3rd deeds of trust."[8]

---

[7] Md. Ann. Code rule W75, sec. a (1957), reads:

Upon a sale of mortgaged property * * * a person claiming an interest in the equity of redemption may apply to the court ratifying the sale to have the surplus of the proceeds of sale, *after payment to the mortgagee of his claim and expenses,* paid over to such person, or so much thereof as will satisfy his claim, and the court shall order distribution of such surplus equitably among the claimants thereto. [Emphasis added.]

[8] See n. 2 *supra.*

The requirements of Maryland law, the deed conveying Sweden Point to Burns, and petitioners' statement in State court persuade us that the debt secured by the second deed of trust was satisfied from the proceeds of the foreclosure sale. Therefore, we conclude that Sweden Point, when acquired by Burns and subsequently reacquired by petitioners, was not subject to the second deed of trust.

In addition to the second deed of trust, petitioners contend they acquired Sweden Point from Burns subject to a mechanics' lien in the amount of $5,268.

During the period that Sam Christopher was in possession of Sweden Point, General Equipment Sales & Distributing Co., Inc., made improvements to the property, receiving a promissory note. At the foreclosure proceeding, First National, as assignee of the promissory note, filed a claim in the Circuit Court for Charles County, Md., to obtain part of the proceeds from the foreclosure sale. First National's claim was disallowed by the court-appointed special auditor. Exceptions to the special auditor's report were filed, and trial was scheduled on the matter. Prior to trial, however, First National and petitioners reached a settlement, and the matter was dismissed with prejudice. No record is present concerning the terms of settlement.

Upon the subsequent sale of Sweden Point to the State of Maryland, part of the proceeds were distributed to First National in satisfaction of a deed of trust. Petitioners point to this distribution to prove they purchased Sweden Point from Burns subject to the mechanics' lien securing First National's promissory note.

Generally, the proceeds of a foreclosure sale are first used to satisfy the mortgagee's claim and expenses. If there is a surplus after payment of the mortgagee's claim, persons holding junior claims who have been made parties defendant in the foreclosure proceeding receive the surplus in the order of the priority of their liens. Their liens on the property, however, are terminated by the foreclosure suit. 3 Powell, Real Property 696.23 (1975). See also *Gerber v. Karr,* 231 Md. 180, 189 A. 2d 353 (1963); *Garner v. Union Trust Co. of Md.,* 185 Md. 386, 45 A. 2d 106 (1945).

In Maryland, in order to obtain any surplus from a foreclosure sale, junior lienors are required to apply to the court ratifying the

sale.[9] The court ratifying the sale is specifically given the authority to determine the respective rights of persons—including holders of mechanics' liens—entitled to share in the proceeds of the sale.[10] In compliance with these rules, First National, as successor in interest to the mechanics' lien, filed a claim to the proceeds of the foreclosure sale. As a result of an out-of-court settlement between First National and petitioners, the claim was dismissed with prejudice, the surplus of the foreclosure sale, $14,336.90, was distributed to petitioners, and Burns' title to Sweden Point subject to a first deed of trust was formally recorded.

Although we do not have the terms of the settlement before us, petitioners, as part of the settlement, could not have encumbered Sweden Point, since it had been sold at the foreclosure sale to Burns. Consequently, when Burns later sold the property back to petitioners, it was unencumbered by First National's claim, and therefore, we conclude that petitioners' basis did not include the amount of First National's claim.

We cannot change our conclusion merely because First National was entitled to a portion of the proceeds from the sale of Sweden Point to the State of Maryland. It is entirely possible that petitioners granted First National a deed of trust on Sweden Point after they reacquired the property from Burns, and this encumbrance secured petitioners' personal debt to First National resulting from their out-of-court settlement. Although petitioners could have satisfied First National's claim out of the proceeds of the foreclosure sale, they chose to settle out of court and thereby receive the full $14,336.90. Petitioners may have delayed payment of First National's claim through this scheme; it does not, however, allow petitioners to increase their basis in Sweden Point by the amount of the claim.

The final item that petitioners contend should be included in their basis of Sweden Point is $5,250 allegedly spent constructing a porch subsequent to their reacquisition of the property. The only evidence submitted by petitioners as to the existence of a porch on the property, the time of construction, and the cost of

---

[9] See n. 7 *supra.*

[10] Md. Ann. Code rule BG74, sec. a (1957), reads in part: "If all or any part of property against which a mechanics' lien claim is recorded shall be sold under * * * foreclosure * * * the court * * * which entered such judgment * * * may determine the respective rights of the persons entitled to share in the proceeds of the sale."

construction was oral testimony by petitioner J. Carl Hill. At trial, petitioner gave conflicting testimony as to the date of construction. Although petitioner claimed to have spent $5,250 on construction, he submitted no written records or additional oral testimony confirming any expenditures. Finally, although petitioner claimed to have retained personal written records of amounts expended constructing the porch, and although petitioner suggested that the records were in the courtroom at the time of trial, he made no attempt to disclose the records or submit them into evidence.

The Commissioner's determinations of a taxpayer deficiency are presumptively correct, and the petitioner has the burden of proving the Commissioner's determination wrong. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Under the circumstances, we do not believe petitioners' uncorroborated, oral testimony meets this burden.

Since petitioners have failed to show that they are entitled to the nonrecognition benefits of section 1033 or that their basis in Sweden Point should exceed $33,375,

*Decision will be entered for the respondent.*