ESTATE OF DAVID ENGELSTEIN, DECEASED, AHLEEN ENGELSTEIN, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Engelstein v. Commissioner
Docket No. 719-74.
United States Tax Court
T.C. Memo 1977-219; 1977 Tax Ct. Memo LEXIS 221; 36 T.C.M. (CCH) 914; T.C.M. (RIA) 770219; July 14, 1977, Filed Donald J. Ball, for the petitioner. David R. Smith, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of David Engelstein, now deceased, for calendar years 1963 and 1968 in the amounts of $3,116.29 and $19,179.32, respectively. The sole issue for decision is whether David Engelstein was entitled to elect the nonrecognition provisions of section 1033, I.R.C. 1954, [1] when he received condemnation proceeds in 1963 and 1968 but did not purchase replacement property until 1969. Resolution of this issue turns on whether the amount realized by Mr. Engelstein in 1963 exceeded his adjusted basis in the condemned property. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. *223 David Engelstein, the original petitioner in this case, filed individual Federal income tax returns for calendar years 1963 and 1968 with the District Director of Internal Revenue, Buffalo, New York and with the Internal Revenue Service Center, Andover, Massachusetts, respectively. At the time of filing the petition in this case, Mr. Engelstein resided in Syracuse, New York. Mr. Engelstein died on October 23, 1975, while this action was pending and before trial. On December 24, 1975, this Court granted a motion to substitute as party herein the Estate of David Engelstein, Deceased, Ahleen Engelstein, Executrix. Lena Engelstein, sister of petitioner David Engelstein, purchased real property and improvements located at 613-615 Harrison Street, Syracuse, New York, on July 29, 1938. Subsequently on December 7, 1956, she acquired real property and improvements located at 617 Harrison Street from her father, Harry Engelstein, and Aaron Kruth, an unrelated party. This property had been purchased by Harry Engelstein and Aaron Kruth on October 29, 1954. During the period Lena Engelstein owned the property at 613-617 Harrison Street, David Engelstein managed it. Mr. Engelstein was *224 a real estate broker and appraiser. On September 9, 1960, Lena Engelstein was advised by the Syracuse Office of Urban Renewal that the property at 613-617 Harrison Street was to be appropriated by the City of Syracuse as part of a renewal project. On December 31, 1962, Lena Engelstein transferred her interest in 613-617 Harrison Street to petitioner David Engelstein. This conveyance was recorded on January 2, 1963. The deed states that consideration for the conveyance was one dollar "and other good and valuable consideration." No documentary tax stamps are affixed to the deed. At the time, Mr. Engelstein owned property adjoining the 613-617 Harrison Street property. The City of Syracuse physically appropriated the 613-617 Harrison Street property on October 23, 1963. On that date, 617 Harrison Street was a vacant lot, 613 Harrison Street included an apartment building and part of a concrete block warehouse or garage, and 615 Harrison Street included the remainder of the concrete block building and a building containing apartments and a store. At all times prior to the condemnation, David Engelstein held these properties as rental properties. On November 22, 1963, Mr. *225 Engelstein received a payment of $30,000 from the City of Syracuse as a partial condemnation award. Mr. Engelstein disputed the amount of the condemnation award with the City of Syracuse in 1963, and litigation was commenced. Administrative hearings were held in 1966 to determine the amounts of condemnation awards to be paid by the city to property owners in the Harrison Street area. David Engelstein testified at those hearings on November 3, 1966. A redetermination of the amount of the condemnation award was sought and obtained from the County Court of Onondaga County. The amount thus awarded was $105,787.50, plus interest and costs of $13,166. On May 29, 1968, Mr. Engelstein received from the City of Syracuse $88,955.50, representing the balance of the award including interest and costs after deduction of the initial $30,000 payment. Lena Engelstein did not receive any part of the condemnation proceeds, nor had she ever received any cash payment for the 613-617 Harrison Street property at the time of the trial in this case. In 1969, Mr. Engelstein acquired the following properties as replacements for the 613-617 Harrison Street property: Date of Acquisition
Location
Cost
January 1969
909 Harrison St.
$ 40,000
December 1969
900 S. Salina St.
40,000
December 1969
105 Slocum Ave.
10,000
December 1969
722 University Ave.
22,200
December 1969
1244 S. State St.
12,800
$125,000
*226 The acquisition of the replacement property was reported on the joint Federal income tax return filed by David and Ahleen Engelstein for the calendar year 1969. David and Ahleen Engelstein were married in 1969. On January 30, 1975, while in the hospital, David Engelstein executed a demand note payable to Lena Engelstein in the amount of $150,000 and bearing 6 percent interest. This note was a renewal of another note that had been executed February 10, 1969. The note of January 30, 1975, on its face did not reflect the purpose for which it was given. The note and an accompanying letter had been prepared by the staff of Mr. Engelstein's accountant, were signed in the accountant's presence, and were returned to the accountant after execution. Lena Engelstein did not know of the existence of this note until after David Engelstein's death. Although she learned of the existence of the note shortly after Mr. Engelstein's death, Lena Engelstein never had possession of the note and first saw it shortly before the trial in this case. Lena Engelstein had received no payment on the note at the time of the trial in this case. On his Federal income tax return for the calendar year 1963, *227 David Engelstein disclosed nothing concerning the condemnation of the 613-617 Harrison Street property, nor did he file or cause to be filed an application for extension of time in which to replace the condemned property. On his Federal income tax return for calendar year 1968, Mr. Engelstein disclosed the involuntary conversion of the 613-617 Harrison Street property and elected to defer the gain realized on the conversion. This was the first disclosure of the conversion made by Mr. Engelstein.The return stated that the condemned property had been acquired in 1938 and improved in 1958 and that its cost basis was $23,428. It stated that depreciation allowed had been $17,358.60 and it reported $6,069.40 as the adjusted basis in computing the gain realized. In his notice of deficiency, respondent determined that Mr. Engelstein's adjusted basis in the 613-617 Harrison Street property was only $6,069.40 at the time it was condemned and that he thus first realized gain on the condemnation in 1963 on the receipt of $30,000. As a result, respondent determined that Mr. Engelstein was not entitled to elect nonrecognition under section 1033 in 1963 and 1968 because the replacement in 1969 *228 had not occurred within the time specified in section 1033(a)(3)(B). Respondent determined that Mr. Engelstein had recognizable gains in 1963 and 1968 of $23,930.60 and $75,937.50, respectively.
OPINION The issue here is purely factual since both parties recognize that if Mr. Engelstein had any gain on the conversion of the property in 1963 he is not entitled to the benefits of section 1033, but if he did not receive the full return of his basis in the property until the receipt of the final award in 1968, he properly claimed the application of that section. Section 1033 is a relief measure which provides that gain realized on involuntary conversion of property may not be recognized under certain circumstances where the converted property is replaced. For the years here in issue, 1963 and 1968, this section provided in part: SEC. 1033.INVOLUNTARY CONVERSIONS. (a) General Rule.--If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted-- (1) Conversion *229 Into Similar Property.--Into property similar or related in service or use to the property so converted, no gain shall be recognized. * * *
(3) Conversion Into Money Where Disposition Occurred After 1950.--Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of Gain.--If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate *230 may by regulations prescribe. For purposes of this paragraph-- (i) no property or stock acquired before the disposition of the converted property shall be considered to have been acquired for the purpose of replacing such converted property unless held by the taxpayer on the date of such disposition; and (ii) the taxpayer shall be considered to have purchased property or stock only if, but for the provisions of subsection (c) of this section, the unadjusted basis of such property or stock would be its cost within the meaning of section 1012. (B) Period Within Which Property Must Be Replaced.--The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending-- (i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or (ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application *231 by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * *
(g) Condemnation of Real Property Held for Productive Use in Trade or Business or for Investment.-- (1) Special Rule.--For purposes of subsection (a), if real property (not including stock in trade or other property held primarily for sale) held for productive use in trade or business or for investment is (as the result of its seizure, requisition, or condemnation, or threat or imminence thereof) compulsorily or involuntarily converted, property of a like kind to be held either for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the property so converted. It is clear that the property at 613-617 Harrison Street was involuntarily converted on October 23, 1963, and that Mr. Engelstein received sums of $30,000 in 1963 and $75,787.50 in 1968 in exchange for the property. Furthermore, Mr. Engelstein purchased certain properties as replacement for the converted property during 1969. The principal disagreement between the parties is over whether Mr. Engelstein *232 replaced the converted property within the time period required by section 1033(a)(3)(B).
Respondent determined that Mr. Engelstein first realized part of his gain in 1963 on receipt of the $30,000 payment because that amount exceeded his basis in the property. Because replacement did not occur within "one year after the close of [that] first taxable year in which any part of the gain upon the conversion [was] realized," respondent contends that petitioner is not entitled to nonrecognition under section 1033 of any portion of the gain. Petitioner, on the other hand, claims that Mr. Engelstein's adjusted basis in the 613-617 Harrison Street property exceeded $30,000 on the date of conversion, with the result that no gain would be realized until 1968 when Mr. Engelstein received the second payment from the City of Syracuse. Petitioner then asserts that replacement in 1969 meets the requirement of section 1033(a)(3)(B)(i). [2] Respondent concedes that, if Mr. Engelstein first realized gain in 1968, he was entitled to elect the benefit of section 1033 and complied with the election requirements. *233 It is well established that when condemnation proceeds are received under a claim of right, and are not subject to any limitation on use, gain is realized when the receipts exceed the adjusted basis of the condemned property. E.g., R. A. Stewart & Co. v. Commissioner,57 T.C. 122 (1971); Feinberg v. Commissioner,45 T.C. 635, 640-641 (1966), affd. 377 F.2d 21 (8th Cir. 1967).The $30,000 payment received by Mr. Engelstein in 1963 was received without any restriction on use. Thus, if that payment exceeded his adjusted basis in the 613-617 Harrison Street property, gain was realized in 1963 and respondent must prevail. Section 1011 provides that adjusted basis for determining gain or loss from the sale or other disposition of property is the basis of the property, adjusted for such items as depreciation allowed or allowable. Under section 1012, basis of property is its cost except as otherwise provided, and cost is defined as the amount paid in cash *234 or other property. Section 1.1012-1(a), Income Tax Regs. Petitioner contends that the 613-617 Harrison Street property was acquired by David Engelstein at a cost in excess of $30,000. Respondent, while admitting in his answer that the property was "purchased," argues that petitioner has not proved that any consideration was paid for the property and that, in fact, it was acquired by gift with a carryover basis under section 1015(a). Respondent argues that in any event petitioner has totally failed to carry its burden of showing that, if Mr. Engelstein "purchased" the property, his cost basis in the property exceeded the $6,069.40 basis determined by respondent. The evidence clearly establishes that no cash or tagible property was transferred by David Engelstein to his sister in exchange for the Harrison Street property. However, petitioner contends that Mr. Engelstein incurred at the time of acquisition an obligation to pay his sister at a later date and claims that this liability was includable in his cost basis of the property. We find that David Engelstein incurred no fixed and definite liability in 1963 or in 1968 to pay any sum for the property *235 in excess of the adjusted basis determined by respondent, $6,069.40. Therefore, we find that Mr. Engelstein's adjusted basis did not exceed that amount in 1963 or in 1968 and that Mr. Engelstein realized a gain in 1963 on receipt of $30,000. Petitioner placed into evidence the testimony of Lena Engelstein, the decedent's sister, who testified that she did not intend a gift to her brother and that although she had not been paid any amount for the property transferred she had expected to be paid some amount. However, she admitted that no specific amount was discussed at the time of transfer and that she simply expected her brother to "do the fair thing." Although she felt her brother's estate was liable to her for the "fair value" of the property, she testified that she did not intend to present a claim for that value to the estate. She felt that the estate would pay her if it was "able." In addition to this testimony, petitioner introduced the testimony of an appraiser who was a friend of Mr. Engelstein. This appraiser testified to certain conversations he had with Mr. Engelstein. While the statements attributed to Mr. Engelstein are hearsay when offered to prove the truth *236 of the assertions, it would appear that they were statements contrary to decedent's pecuniary interest within the exception to Rule 802, Federal Rules of Evidence, provided by Rule 804(b)(3), Federal Rules of Evidence. However, these statements add little to the testimony of decedent's sister. Mr. Engelstein was said to have indicated that he was to pay for the property and that he was obligated to pay for the value of the property. Beyond this, the witness could only testify that he suggested a range of values to Mr. Engelstein and a method of computation that never entered into the discussions between Mr. Engelstein and his sister. The witness was apparently under the impression that Mr. Engelstein had actually paid his sister this value, which the record shows not to be correct. Mr. Engelstein's accountant testified by deposition. This accountant identified a letter that was signed simultaneously with the note executed January 30, 1975, payable to Lena Engelstein in the amount of $150,000. This letter was addressed to and prepared by the accountant and executed by the decedent after the filing of the petition in this case. It is vague and selfserving and totally unreliable *237 as evidence to support a contention that Mr. Engelstein had executed any notes to Lena Engelstein other than the February 10, 1969, note and the January 30, 1975, note. This latter note to Lena Engelstein was executed and the letter prepared and signed shortly before this case was originally set for trial on March 17, 1975. The letter does not indicate the amount of the February 10, 1969, note or the amount of the notes, if any, which might have been destroyed at the time the February 10, 1969, note was signed. The letter states that the February 10, 1969, note was not destroyed, and petitioner has not accounted for its failure to produce this note. Mr. Engelstein's accountant testified, independently of the letter and without objection, that Mr. Engelstein's obligations to his sister had been the subject of discussion between him and the decedent "for a number of years" and that the purpose of delivering the note and letter into his possession was to put the obligations "on paper." He stated that he held the note and letter for Lena "for security." [3]
*238 Finally, petitioner has produced evidence it feels provides the final link in its case: Testimony that Lena Engelstein "[assumed]" that the value to be paid her by her brother's estate was $50,000, since that amount of the $150,000 note was not explainable on any other basis, the fact that the city's initial offer was $50,000, and the testimony by an appraiser that he suggested to the decedent that "a fair price that Lena should get for the property" was between $38,000 and $52,000. Petitioner adds this evidence to the testimony previously discussed and concludes that David Engelstein had an obligation to pay his sister some amount in excess of $30,000 in 1963. We find that the evidence does not support this tortured conclusion. We note first that Mr. Engelstein's own actions and testimony undercut petitioner's position. On his Federal income tax return for 1968, Mr. Engelstein reported $6,069.40 to be his adjusted basis for the Harrison Street property. He apparently obtained this figure by taking the original cost of the property to his sister in 1938, adding the cost of improvements and subtracting depreciation allowed. Such an analysis would obviously be improper unless *239 the transfer were deemed a gift to the decedent with no consideration passing from him. Furthermore, on November 3, 1966, at an administrative hearing concerning the condemnation, Mr. Engelstein answered "No consideration" when asked if he had paid his sister any consideration for the Harrison Street property.[4]
*240 Furthermore, while the evidence establishes that some obligation was owed Lena Engelstein by her brother, it does not support a finding that any fixed and definite liability existed during either 1963 or 1968, the years here in issue. Petitioner's evidence shows that the decedent had in a sense an obligation during those years to do the "fair thing" with regard to his sister but that this obligation did not take form or substance until after the years in issue. There is no competent evidence indicating that any amount was determined by the decedent as the amount owed his sister any earlier than February 10, 1969. Nor is there any evidence that an obligation in excess of the amount determined by respondent to be decedent's adjusted basis was enforceable by Lena Engelstein at any time during 1963 or 1968. On the whole, we find any obligation owed Lena Engelstein in connection with the Harrison Street property to be too contingent and too speculative to constitute a liability includable in Mr. Engelstein's basis in the property. A mere expectation of some indefinite payment on the part *241 of one party with respect to property and an acknowledgment by the other party of a similarly indefinite obligation do not establish a liability sufficient to establish a cost basis in property. See Columbus & Greenville Railway Co. v. Commissioner,42 T.C. 834, 847-50 (1964), affd. 358 F.2d 294 (5th Cir. 1966); Albany Car Wheel Co. v. Commissioner,40 T.C. 831, 839 (1963), affd. 333 F.2d 653 (2d Cir. 1964). [5]
The facts in this record show that Lena Engelstein at the date of the trial of this case had not been paid any amount by her brother or his estate for the Harrison Street property and did not intend to make a claim for any such payment against the estate. The facts also show that Mr. Engelstein considered that he had given Lena "no consideration" for the property and that in 1968 he considered his basis in the property to be $6,069.40. On the basis of this record we conclude that petitioner has failed to establish that Mr. Engelstein had a basis *242 in the Harrison Street property transferred to him by his sister in excess of the $6,069.40 used in his 1968 return and determined by respondent to be his basis in the property. Petitioner in its reply brief made an alternative argument that, if this Court finds that David Engelstein's adjusted basis was not in excess of that determined by respondent, the Harrison Street property should be found to have been held jointly by David Engelstein and his sister when condemned and only one-half of any gain resulting should be taxed to petitioner. Not only is this position contradicted by the testimony of Lena Engelstein introduced by petitioner, it finds no significant support elsewhere in the record. Petitioner points to David Engelstein's testimony before an administrative board in which he described the property as "family owned property" and stated that between his sister and himself the property was considered "as owned by the two of" them. However, while these statements reflect the familial relationship between David and Lena Engelstein, they do not affect the legal or beneficial ownership of the property. We find petitioner's alternative argument without merit. Decision *243 will be entered for the respondent . Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Mr. Engelstein did not file an application for extension of the replacement period of sec. 1033(a)(3)(B). Petitioner has made no showing or claim that an extension was granted pursuant to the provisions of sec. 1033(a)(3)(B)(ii) and sec. 1.1033(a)-2(c)(3), Income Tax Regs. This section of the regulations states in part: Sec. 1.1033(a)-2. [Income Tax Regs.] Involuntary conversion where disposition of the converted property occurred after December 31, 1950. * * *
(c) Conversion into money or into dissimilar property. * * * (3) The period referred to in subparagraphs (1) and (2) of this paragraph is the period of time commencing with the date of the disposition of the converted property, or the date of the beginning of the threat or imminence of requisition or condemnation of the converted property, whichever is earlier, and ending one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or at the close of such later date as may be designated pursuant to an application of the taxpayer. Such application shall be made prior to the expiration of one year after the close of the first taxable year in which any part of the gain from the conversion is realized, unless the taxpayer can show to the satisfaction of the district director-- (i) reasonable cause for not having filed the application within the required time, and (ii) the filing of such application was made within a reasonable time after the expiration of the required period of time. The application shall contain all of the details in connection with the involuntary conversion. Such application shall be made to the district director for the internal revenue district in which the return is filed for the first taxable year in which any of the gain from the involuntary conversion is realized. No extension of time shall be granted pursuant to such application unless the taxpayer can show reasonable cause for not being able to replace the converted property within the required period of time.↩
3. The record shows that Mr. Engelstein was single when he filed his 1963 and 1968 returns, and that he was married during the year 1969. The 1968 return also makes reference to the interest on a joint bank account which Mr. Engelstein had with his sister, Lena, being reported on Lena's return. The deed of property from Lena Engelstein to her brother, David, executed on December 31, 1962, shows the address of both Lena and David as 300 Demond Drive, Syracuse, New York, and in her deposition Lena testified that she had resided in New Haven for only 2 years.Lena testified that she had not known of the $150,000 note until after her brother's death, but since it must have "included another debt * * * the amount of which I knew," she assumed that $50,000 of the amount "couldn't have been for anything else that I know of" except the Harrison Street property. Lena Engelstein never explained what "other debt" of which she knew existed or whether she had any knowledge of the February 10, 1969, note or its amount. A fair indication from all of these facts is that the discussions between Mr. Engelstein and his accountant and lawyer with respect to separating the business affairs of Mr. Engelstein and his sister, Lena, were concerned with sorting out these affairs in some manner because of the impending marriage and actual marriage of David Engelstein in 1969. However, no inference can be drawn from these facts as to what obligation, if any, David Engelstein had to Lena Engelstein with respect to the specific Harrison Street property. Certainly the clear inference is that until sometime in 1969 no thought had been given to what obligation, if any, Mr. Engelstein had to Lena Engelstein with respect to this property.↩
4. Petitioner has objected to the admission of this testimony, but we find it admissible. This testimony is before the Court as an exhibit to the Stipulation of Facts filed in accordance with Rule 91, Tax Court Rules of Practice and Procedure. Although the transcript before us is stipulated to be a true and complete copy of Mr. Engelstein's testimony, petitioner objects to its admission as irrelevant, immaterial and incompetent. Petitioner particularly argues that a certain portion of the testimony, one in which Mr. Engelstein answered "No consideration" when asked if there was any consideration for the transfer of the Harrison Street property to him, was not an admission against interest, the theory under which petitioner asserts prior testimony of a party is generally accepted. Petitioner argues that the testimony was not against Mr. Engelstein's interest at the time made.
We cannot imagine comments more relevant or material to the question of Mr. Engelstein's basis in the property than Mr. Engelstein's own statements concerning the consideration paid by him for the property. Further, petitioner has advanced no opposing considerations to admission on these grounds. Neither do we find any basis to exclude the testimony on the ground of hearsay as suggested by petitioner's brief. It appears from the language of the stipulation that petitioner waived its right to object to the testimony on the basis that it might be hearsay and reserved its right to object only on the grounds of materiality and relevancy. In any case, petitioner's objection is misplaced since under Rule 801(d)(2) of the Federal Rules of Evidence such testimony is not hearsay when offered against the petitioner, but is an admission by a party-opponent. The rule allowing admission of a party's prior statements when offered against him does not carry a requirement that the statement be against his interest when made but only that it be contrary to a present position. 4 Wigmore, Evidence, secs. 1048-49, p. 5-9 (Chadbourn rev. ed. 1972); McCormick, Evidence, sec. 262, p. 630-31 (2d ed. 1972); see Erceg v. Fairbanks Exploration Co.,95 F.2d 850, 854-55 (9th Cir. 1938). Furthermore, statements of the decedent David Engelstein, petitioner's predecessor in interest, are admissible against petitioner as admissions of a party. 4 Wigmore, Evidence, sec. 1081, p. 201 (Chadbourn rev. ed. 1972); see Webb v. Martin,364 F.2d 229, 232 (3d Cir. 1966); Bendett v. Bendett,315 Mass. 59, 52 N.E.2d 2, 4 (1943); Stiles v. Newschwander,49 A.2d 572, 574↩ (N.J. Ch. 1946).
5. See also Rodman v. Commissioner,542 F.2d 845↩ (2d Cir. 1976), affg. on this issue and revg. on another a Memorandum Opinion of this Court.