HAROLD F. STROUPE and ELIZABETH S. STROUPE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stroupe v. Commissioner
Docket No. 2911-76.
United States Tax Court
T.C. Memo 1978-55; 1978 Tax Ct. Memo LEXIS 455; 37 T.C.M. (CCH) 280; T.C.M. (RIA) 780055; February 14, 1978, Filed Richard D. Hall, Jr., for the petitioners. William S. Patterson, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in the amounts of $63,934 and $73,703 in petitioners' Federal income taxes for 1971 and 1972, respectively. Petitioners have conceded one issue, and the issues remaining for decision are: 1. The proper date for the valuation of the Food Town Stores, Inc., restricted, unregistered stock which petitioners received on the liquidation of Stroupe's Super Market, Inc.; and 2. The fair market value of the Food Town Stores, Inc., restricted, unregistered stock on that date. FINDINGS OF FACT Petitioners Harold F. Stroupe and Elizabeth S. Stroupe, husband and wife, were legal residents *456 of Mount Holly, North Carolina, when they filed their petition. They timely filed joint Federal income tax returns for 1971 and 1972 with the Director, Internal Revenue Service Center, Southeast Region, Memphis, Tennessee. In approximately 1950, Harold F. Stroupe (hereinafter referred to as petitioner) formed Stroupe's Super Market, Inc. (Stroupe's Market). The shareholders of the corporation were petitioner, his wife, petitioner's brother, Charles Stroupe, Clyde Thrower, and Graham Terry. Petitioner owned the controlling interest. The corporation operated a store with a floor space of 28,200 square feet in North Belmont, North Carolina. The store served a shopping area which had a population of approximately 15,000 to 20,000 people. In addition to numerous independent grocers, Winn-Dixie, Harris-Teeter, and two A & P stores also served the area. In March 1971, Ralph Ketner, president of Food Town Stores, Inc. (Food Town) contacted petitioner regarding the possibility of Food Town's acquiring the assets and inventory of Stroupe's Market for cash and some of Food Town's common stock. Food Town operated a chain of food stores throughout the Piedmont section of North Carolina. *457 Petitioner was receptive to the offer. Because of concern for his health he wanted to cut back his work activities. Petitioner reported Food Town's inquiry to his fellow shareholders. However, none of them were interested in accepting Food Town stock in exchange for their Stroupe's Market stock. Consequently, petitioner negotiated with his fellow shareholders and consummated a purchase of their stock on April 1, 1971. The percentage of stock owned by these selling shareholders and the amounts paid by petitioner therefor were as follows: Percentage of
Amount Received
Stock Owned
for Stock
Graham Terry
4.72
$ 27,370.67
Charles Stroupe
1.42
8,234.40
Clyde Thrower
23.63
137,100.00
Total
29.77
$172,705.07
Upon consummation of this transaction, petitioner owned all but one share of Stroupe's Market stock, and that remaining share was owned by his wife. On April 15, 1971, Stroupe's Market's shareholders voted to liquidate the corporation in accordance with the provisions of section 337. [1]/ Subsequently, on April 20, 1971, Stroupe's Market entered into a purchase and sale agreement with Food Town. In pertinent part, the agreement provided *458 as follows: (1) Sale of certain assets. The Seller shall sell to the Purchaser all of its inventory of merchandise or stock of goods located in its store in North Belmont, North Carolina, and all of its merchandising fixtures, equipment, supplies and all other physical assets * * * and all other tangible assets of the store business owned and operated by the Seller at 510 Woodlawn Avenue, North Belmont, North Carolina, under the name of Stroupe's Super Market, Inc. 2. Purchase price. In consideration for such sale, the Purchaser shall pay to Seller the sum of One Hundred Thousand ($100,000.00) Dollars in cash, for the merchandising equipment, fixtures and supplies as described herein, and the Purchaser shall issue and deliver to the Seller, or to its nominees, Seventeen Thousand Five Hundred (17,500) shares of its common capital stock, which for the purposes of this Agreement has an agreed value of One Hundred Fifty Thousand ($150,000.00) Dollars, for the stock of goods, wares and merchandise of Seller. If as of the date of the closing of this transaction an inventory taken by the parties shall disclose the value of said complete inventory of goods, wares and merchandise *459 to be less or more than One Hundred Fifty Thousand ($150,000.00) Dollars, then, if less, the Seller for the above agreed purchase price shall transfer cash to the Purchaser in the amount of such difference, or if more, the Purchaser shall pay the Seller an additional purchase price in cash in the amount of such difference. It is agreed that said inventory shall be taken on May 3, 1971, or such date thereafter as the parties may agree * * *. Said sum of One Hundred Thousand ($100,000.00) Dollars shall be paid to Seller by Purchaser on the date of the closing and the aforesaid shares of stock shall be delivered to Seller by Purchaser within fourteen (14) days of said closing date, or such earlier date as may be possible. * * *
5. Stock Acquired for Investment. Seller represents to Purchaser that it is acquiring this capital stock in Food Town Stores, Inc. as a long term investment after thorough investigation by Seller of Food Town Stores, Inc. and its operations. 6. Lease agreement. Seller represents that it is the owner in fee simple of the title to the tract of approximately three acres upon which its store is located and that it will enter into a lease *460 of said premises to Purchaser simultaneously with the closing of this transaction on the following terms and conditions: For an original term of ten (10) years with two successive options thereafter of five (5) years each at a minimum rental of Forty Thousand ($40,000.00) Dollars per year, payable monthly in advance on or before the 10th. of each month, and additional rental in an amount equal to the amount by which 1% of the gross annual sales of the Purchaser in each 12 month period of the lease exceeds the sum of $40,000.00 per year, payable within 60 days after the end of each such period and upon such other terms and conditions as the parties have agreed upon. 7. Covenant not to Compete. Harold Stroupe, President of Seller, in consideration of the foregoing, covenants and agrees that he will not, either directly or indirectly, through stock ownership or otherwise, engage in a food super market business or any similar or competing business within fifteen (15) miles of 510 Woodlawn Avenue, North Belmont, North Carolina, at any time during the existence of the aforesaid lease or any extension or renewal thereof. *461 During negotiations leading to this agreement, the parties did not discuss the value of petitioner's covenant not to compete or whether any part of the consideration petitioner received was attributable to the covenant. Nor was there discussion of the transfer of any intangible assets to Food Town. On May 3, 1971, the parties entered into the lease agreement pursuant to provision 6 of the purchase and sale agreement. Also on that date Stroupe's Market transferred all of its inventory and other assets to Food Town in exchange for $100,000 in cash and 17,500 shares of restricted, unregistered Food Town common stock (also referred to as "lettered" stock). Although provision 5 of the agreement stated that the seller represented to the purchaser that it was acquiring the Food Town stock as a long term investment, petitioner did not understand that the Food Town stock received by Stroupe's Market would be restricted. An independent consulting firm took an inventory of Stroupe's Market's merchandise, as required by provision 2 of the purchase and sale agreement. The firm valued the merchandise at $127,166.92. Stroupe's Market therefore returned $22,833.08 to Food Town. In its *462 audited 1971 annual report, Food Town treated the shares transferred to Stroupe's Market as if they had a total fair market value of $150,000. Food Town increased this estimated value to $201,250 in its audited 1972 annual report. After the sale to Food Town, petitioner and Clyde Thrower terminated completely their association with the store, and petitioner's brother began to work there only part-time. However, most of the Stroupe's Market employees continued to work for Food Town. Graham Terry became the manager of the store. On December 23, 1971, Stroupe's Market, in partial liquidation, distributed to petitioner 7,500 shares of its Food Town stock. The remaining 10,000 shares were transferred to petitioner on January 10, 1972. The following notation was printed on the stock certificates, each covering 500 shares of stock: THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND ARE HELD FOR INVESTMENT PURPOSES ONLY.
Under the Securities Act of 1933, referred to in this notation, exemptions from the registration requirement on *463 the sale of securities are provided for their issuer in private placements and to persons "other than an issuer, underwriter, or dealer" (15 U.S.C. sec. 77(d)(1)). Food Town, as the issuer, therefore was exempted from the registration requirements when it issued the 17,500 restricted shares to Stroupe's Market in the private placement. Petitioner, on the other hand, in order to sell the restricted shares in a public offering without registration would have been required to show that he was not an "underwriter." He clearly was not an issuer or dealer. One element of the definition of an "underwriter" which petitioner would have been required to prove was that he did not acquire the shares from Food Town with a view to distribution (i.e., resale). In order to establish this requisite intent petitioner first would have been required to sign an "investment letter" in which he stated that he intended to hold the securities for investment. Provision 5 of the purchase and sale agreement satisfied this requirement. In addition, as further proof of his initial intent and in order to sell the stock publicly, petitioner would either have had to convince the Securities *464 and Exchange Commission (S.E.C.) that there had been a change in circumstances or that the length of time he held the stock is evidence in itself that he originally had the investment intent. A 2-year holding period was generally the very minimum.
The new S.E.C. Rule 144 ( 17 C.F.R. sec. 230.144 (1976)), effective April 15, 1972, applicable to shares acquired after that date and, at the option of the owner, to shares acquired before that date, provided that a person in petitioner's position publicly selling the unregistered stock would not be engaged in a distribution, and therefore not an underwriter, provided that: (a) The stock be owned and fully paid for by the seller for at least 2 years; (b) If not traded on an exchange, the amount sold during any 6-month period would not exceed 1 percent of the total outstanding shares; (c) If traded on an exchange, the amount sold during any 6-month period would not exceed the lesser of 1 percent of the outstanding shares on the average weekly trading volume during the 4-week period prior to the date of the required *465 notice (to the S.E.C.) of the sale; (d) The stock be sold only in a normal brokerage transaction; (e) Adequate current information be available to the public about the issue of the stock; and (f) Notice of the sale be filed with the S.E.C. Petitioner nevertheless could have sold the stock at any time in a private offering to anyone willing to take the stock and hold it for investment. Also distributed to petitioner during 1971 and 1972 were Stroupe's Market's land and buildings, leased to Food Town, and all the other assets and liabilities not covered by the purchase and sale agreement. On May 13, 1971, Stroupe's Market filed with the North Carolina Secretary of State its articles of dissolution and on April 6, 1972, its certificate of completed liquidation. The following is a summary of Stroupe's Market's balance sheets as of June 30, 1969, June 30, 1970, and April 30, 1971: 6/30/69
6/30/70
4/30/71
Assets
Current assets
$180,913.90
$215,836.84
$190,112.14
Fixed assets
229,881.90
217,249.53
205,812.19
Other assets
21,406.63
25,128.53
27,400.00
Total assets
$432,202.43
$458,214.90
$423,324.33
Liabilities
Current liabilities
$ 91,651.50
$116,114.02
$ 54,860.64
Other liabilities
38,439.75
26,962.94
17,739.26
Total liabilities
$130,091.25
$143,076.96
$ 72,599.90
Shareholders' Equity
Common stock
$ 69,800.00
$ 69,800.00
$ 69,800.00
Additional paid-in capital
28,200.00
28,200.00
28,200.00
Retained earnings
204,111.18
217,137.94
217,137.94
Net earnings
0
0
35,586.49
Total equity
$302,111.18
$315,137.94
$350,724.43
Total Liabilities and
Shareholders' Equity
$432,202.43
$458,214.90
$423,324.33
*466 As of April 16, 1971, the fair market value of Stroupe's Market's real property, included in the fixed assets on the foregoing balance sheet summaries, was appraised by two independent appraisers, Walls Construction Co., Inc., and Bullard Insurance & Realty Co., on behalf of Stroupe's Market as follows: Walls
Bullard
Appraisal
Appraisal
Tract No. 1 - Woodlawn Road
(3 acres and store)
$236,950
$228,000
Tract No. 2 - Next to
Stroupe's Market
13,250
15,000
Tract No. 3 - Clyde Thrower
lot
1,300
1,200
Tract No. 4 - Smith property
opposite the store
12,000
14,000
Total
$263,500
$258,200
Tract No. 1 was the property leased to Food Town pursuant to provision 6 of the purchase and sale agreement. The following table summarizes Stroupe's Market's operations during the periods ended June 30, 1969, June 30, 1970, and April 30, 1971: 6/30/69
6/30/70
4/30/71
Sales
$2,157,074.54
$2,234,598.71
$1,751,878.88
Cost of sales
1,746,483.30
1,808,444.10
1,417,627.97
Gross earnings
$ 410,591.24
$ 426,154.61
$ 334,250.91
Earnings before
income taxes
$ 43,352.89
$ 35,622.48
$ 35,586.49
Net earnings
$ 27,673.78
$ 22,848.68
0
Cash dividends
paid
$ 20,940.00
$ 6,980.00
0
*467 Food Town was incorporated under the laws of the State of North Carolina on August 19, 1957, to operate a chain of retail food supermarkets. During the early 1970's the number of stores it operated increased steadily. In both 1970 and 1971, Food Town opened three new stores, including the Stroupe's Market store. By the end of 1972, during which year two new stores were opened, it was operating 17 stores. The average square footage of these stores was 16,568. By 1973, with the addition of three stores approximately as large as Stroupe's Market's store and the closing of a smaller store, the average square footage increased to 18,100. Food Town, through its subsidiary, Save-Rite, Inc., also served as its own wholesale supplier. The following is a summary of Food Town's consolidated income statement for the 52-week periods ended on the stated dates: 1/3/70
1/2/71
1/1/72
12/30/72
Net sales
$15,432,484
$22,397,340
$37,526,813
$50,963,673
Cost of
goods sold
12,808,019
18,891,629
31,184,814
42,238,982
Income from
operations
315,540
414,575
898,032
1,294,708
Net income
315,540
468,428
982,749
1,396,863
The following is a summary *468 of the consolidated balance sheet of Food Town as of January 3, 1970, January 2, 1971, January 1, 1972, and December 30, 1972: Assets
1/3/70
1/2/71
1/1/72
12/30/72
Current assets
$1,324,270.46
$2,336,374.14
$3,373,463.56
$5,051,596.10
Fixed assets
606,123.71
1,127,737.59
1,990,073.49
2,738,759.76
Other assets
192,025.08
103,349.01
[1]/98,904.30
96,052.68
Total assets
$2,122,419.25
$3,567,460.74
$5,462,441.35
$7,886,408.54
Liabilities
Current
liabilities
$ 816,571.44
$1,257,150.90
$2,131,309.64
$2,566,446.55
Other liabilities
59,301.53
26,098.46
0
25,758.38
Total liabilities
$ 875,872.97
$1,283,249.36
$2,131,309.64
$2,592,204.93
Shareholders'
equity
$1,246,546.28
$2,284,211.38
$3,331,131.71
$5,294,203.61
No. common shares
(less 11,500
Treasury stock)
348,425
400,000
417,500
865,000
Book value per out-
standing share
$3.58
$5.71
$7.98
$6.12
On November 19, 1970, Food Town offered *469 for sale in its first public offering 51,575 of its shares at a price of $12 per share. At the same time certain of its shareholders offered 57,000 of their shares for sale. After paying underwriting commissions of $54,153.75 and offering costs of $39,763.99, Food Town netted $524,982.26 or 84.8 percent of the total offering price. It was estimated that the shareholders in addition to paying the underwriter's commissions would pay $1,005 in expenses. Therefore, the combined discount was 11.8790 percent. The over-the-counter selling price of Food Town's registered, unrestricted stock increased greatly during 1971 and 1972. The records of Carolina Securities Corporation (Carolina Securities), the principal marketmaker of Food Town stock during that period (it purchased and sold approximately 90 percent of such stock), indicate the following: Stock
Number of
Stock
Number of
Price
Month
Purchased
Transactions
Held
Transactions
Low
High
[1]/ 12/70
300
1
500
2
$12.375
$13.00
1/71
4,450
17
3,345
20
12.25
13.875
2/71
6,374
25
6,986
44
11,375
17.00
3/71
4,525 20
3,276
26
16.00
18.00
4/71
3,039
18
3,808
33
16.25
21.50
5/71
7,950
43
7,434
54
20.50
24.57
6/71
9, 083
51
9,602
67
22.75
25.00
7/71
9,424
55
7,390
51
23.00
27.00
8/71
5,420
34
6,587
38
22.75
25.75
[1]/ 9/71
9,620
59
8,564
48
19.50
34.00
10/71
7,144
36
6,886
38
26.50
31.00
11/71
5,995
27
4,624
35
27.50 30.50
12/71
9,278
62
11,825
80
27.00
38.00
1/72
5,060
42
4,284
41
32.50
38.00
Total
87,662
490
85,111
577
*470 As reflected below the size of the block of stock purchased or sold did not have an appreciable effect on its price: Largest Block
Purchased
Price Per Share
Month
or Sold
Highest
Lowest
[1]/ 12/70
300
$13.00
$12.375
1/71
500
13.50
12.50
2/71
700
16.75
16.75
3/71
750
17.00
17.00
4/71
1 ,000
19.00
19.00
5/71
500
24.00
22.50
6/71
600
23.25
23.25
7/71
900
25.75
25.75
8/71
1,200
24.00
24.00
[1]/ 9/71
1,230
26.00
26.00
10/71
1,000
29.375
28.75
11/71
1,000
29.25
28.625
12/71
700
30.50
30.50
1/72
400
36.00
35.00
On December 23, 1971, on which date Carolina Securities purchased 150 shares, the over-the-counter price of Food Town stock was approximately $36 per share. On January 10, 1972, the price had decreased to $34 per share. On January 3, 1972, and January 10, 1972, petitioner received offers from two individuals to purchase 10,000 shares of his restricted, unregistered Food Town stock. The offers, which petitioner did not accept, were for $6 per share and $5.80 per share, respectively. On May 9, 1972, there was a 2-for-1 split of *471 Food Town common stock. After this split, petitioner owned 35,000 shares. In late 1972, petitioner registered and sold 5,000 of his shares in a joint offering of 80,000 shares by Food Town and some of its shareholders. The prospectus describing the offering, filed on October 3, 1972, disclosed that the offering price was $27 per share. After underwriting discounts and commissions, petitioner received $25.20 per share for the shares he sold, less expenses of $741.30. Petitioner thus received 92.78 percent of the total sales proceeds attributable to his stock. Food Town absorbed nearly all of the costs of this offering, incurring expenses of $40,984, and received 86.54 percent of the total sales proceeds of its stock. The total discount for all the stock sold approximated 9.556 percent. During 1973, petitioner sold privately 2,500 shares of his restricted, unregistered common stock. The following schedule indicates the transaction date, number of shares sold, price per share, and gross and net amounts: Price
Trade
No. of
Per
Gross
Net
Date
Shares
Share
Amount
Amount
9/20/73
500
$18.00
$ 9,000
$ 8,857.62
9/24/73
100
19.00
1,900
1,863.30
9/25/73
100
19.00
1,900
1,859.63
9/26/73
100
19.00
1,900
1,865.00
9/26/73
200
19.00
3,800
3,730.00
10/ 2/73
500
25.00
12,500
12,298.32
10/24/73
500
23.00
11,500
11,321.17
11/ 5/73
500
20.00
10,000
9,824.20
*472 Petitioners' expert witnesses, Ronald W. Ridgway and Glen A. Hultquist, in their report dated September 10, 1976, appraised the restricted, unregistered Food Town stock as follows: Valuation Date
Fair Market Value
May 3, 1971
Between $8 and $9 per share
December 23, 1971
Between $10 and $11 per share
January 10, 1972
Between $10 and $11 per share
Respondent's expert witness, John A. Carrick, in his valuation report dated August 27, 1976, appraised the stock as follows: Valuation Date
Fair Market Value
May 3, 1971
No opinion
December 23, 1971
$27-3/16 per share
January 10, 1972
$25-5/16 per share
In their 1971 and 1972 joint Federal income tax returns, petitioners valued the Food Town stock received in liquidation of Stroupe's Market at $6 per share. Petitioners reported $224,033 and $99,201 on their 1971 and 1972 returns, respectively, as additional amounts received in liquidation of Stroupe's Market. In determining deficiencies of $63,934 for 1971 and $73,703 for 1972, respondent used $36 per share as the fair market value for the 7,500 Food Town shares distributed on December 23, 1971, and $32 per share for the 10,000 shares *473 distributed on January 10, 1972. Based on these values, respondent increased petitioners' basis for computing their gain on the sale of the 5,000 Food Town shares during 1972. ULTIMATE FINDING OF FACT The Food Town restricted, unregistered stock which petitioner received in the liquidation of Stroupe's Market had a value of $21.60 per share on December 23, 1971, and $19.20 per share on January 10, 1972. OPINION Issue 1. Valuation Date
For the purpose of determining the amount of their gain to be recognized on the liquidation of Stroupe's Market, petitioners contend that May 3, 1971, the date Stroupe's Market received the Food Town stock in exchange for its merchandising equipment and inventory, is the proper valuation date. Petitioners argue that they constructively received the Food Town stock on that date since, as sole shareholders of Stroupe's Market, they could have required the corporation to immediately distribute the stock to them. We disagree. The stock was still owned by Stroupe's Market, and petitioner's argument would require us to disregard Stroupe's Market as a corporate entity. That we cannot do. In Hill v. Commissioner,66 T.C. 701, 705 (1976), *474 where a corporation had been involuntarily dissolved under State law, this Court stated that for Federal income tax purposes: If a corporation retains assets, even though under State law its legal existence has been terminated and the corporation is in the process of liquidation, it will be treated as a continuing taxable entity. Sidney Messer,52 T.C. 440, 448 (1969), affd. 438 F.2d 774 (3d Cir. 1971). Further, even though the corporation is in the process of liquidation, if the corporation's affairs are substantially unsettled, it will remain in existence for Federal income tax purposes. Hersloff v. United States,159 Ct. Cl. 366, 371-372, 310 F.2d 947, 950-951 (1962). Although there is no precise minimal standard for continued corporate existence, the purchase or sale of assets, the presence of corporate debts, and the distribution of moneys suggest that a corporation is continuing as a taxable entity. Hersloff v. United States,supra.
Subsequent to May 3, 1971, Stroupe's Market continued to hold cash and other *475 assets not sold or leased to Food Town as well as the Food Town stock and lease agreement. The cash, other assets, and lease agreement were not distributed to the petitioners until late 1971 and early 1972. Likewise, during the period May 3, 1971, to April 6, 1972, the date Stroupe's Market filed a certificate of completed liquidation with the Secretary of State of North Carolina, the corporation was in the process of discharging its liabilities. Therefore, for Federal income tax purposes, Stroupe's Market was a continuing taxable entity. Issue 2. Fair Market Value
Respondent maintains that the Food Town lettered stock had a value of $27.1875 per share on December 23, 1971, and a value of $25.3125 per share on January 10, 1972. [2]/ Petitioners contend that the stock's per share value was $10.77 on December 23, 1971, and $10.24 on January 10, 1972.The issue is strictly factual, and we hold that the stock had values of $21.60 per share on December 23, 1971, and $19.20 per share on January 10, 1972. *476 Fair market value is generally defined as the ( Jack Daniel Distillery v. United States,379 F.2d 569, 574 (Ct. Cl. 1967))-- price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts. * * * [Citation omitted.] In reaching a conclusion as to the price at which the restricted stock would have sold on the crucial dates, we begin with the fact that Food Town registered stock was freely traded over the counter. We think the sales of such stock, as summarized in our Findings, were sufficient in number and amount to reflect that stock's value. Cf. Bankers Trust Co. v. United States,518 F.2d 1210, 1219 (Ct. Cl. 1975), cert. denied 424 U.S. 966 (1976); Moore-McCormack Lines, Inc. v. Commissioner,44 T.C. 745, 759 (1965). The price at which it sold was $36 per share on December 23, 1971, and $34 per share on January 10, 1972. However, since the subject stock was unregistered *477 and restricted, it could not have been sold at these prices. To sell it, a discount would have been required. See LeVant v. Commissioner,376 F.2d 434, 441-442 (7th Cir. 1967), revg. on other grounds 45 T.C. 185 (1965); Bolles v. Commissioner,69 T.C. 342 (1977); Husted v. Commissioner,47 T.C. 664, 678-679 (1967). Deciding the appropriate discount requires the exercise of judgment in the light of all the facts. Petitioner argues for a discount of approximately 70 percent. Respondent argues that the discount should be about 25 percent. While we think petitioner seeks too much in the way of a discount, we think the discount should be somewhat larger than that advocated by respondent. On the crucial date of December 23, 1971, as reflected in our Findings and the record, Food Town was a thriving organization. This is reflected in the ratios of pretax profits to net worth (53.5 percent compared to an industry median of 16.3 percent), cost of sales to inventory (12.6 percent compared to an industry median of 14.4 percent), and earnings at 2 percent of sales (compared with 1.3 percent in the industry generally). *478 Moreover, in the 5-year period prior to the valuation dates, the number of stores Food Town operated was growing (increase from 6 in 1967 to 15 in 1971), total sales (increase from $5,852,725 to $36,996,498) and net income (increase from $36,273 to $982,749) were increasing dramatically, and the net income per common share had grown enormously. This growth in these areas was reflected in the sales prices of its registered shares which rose from $12 to $13 per share in early 1971 to $34 per share in January 1972. These statistics on Food Town's growth and the rising trend in the over-the-counter price of its stock would have tended to decrease the discount required to sell its restricted stock. Under the S.E.C. regulations, the restricted stock could have been sold in private sales and, under certain conditions, in public sales without registration. In the private sales, the purchaser in effect would have been required to agree not to resell the stock for 2 years. In addition, the stock could have been registered and sold. Registration, however, would have required action by Food Town itself, and the probability of other shareholders participating in a registration was conjectural. *479 In agreeing to hold the restricted stock for investment rather than resale, a purchaser would not have limited his consideration to Food Town's phenomenal growth and the over-the-counter price increases in its registered stock during the period immediately preceding the valuation dates. The purchaser also would have considered a number of negative factors. Among those negative factors, petitioner's expert points out, the book value per share of Food Town stock in December 1971 and January 1972 was only about one-fourth of the over-the-counter price.It is not at all clear that the actual value of Food Town's assets was greater in an amount sufficient to alter the picture appreciably. The price-earnings ratio was nearly three times higher than certain other companies engaged in similar businesses. As time passed, increased competition and greater sales costs could be expected to cut into future profits. The company's ratio of net worth to total assets was higher than the industry's average, thus indicating that Food Town was relying more heavily on equity rather than borrowed capital. As the company continued to grow, further borrowing would be required, and the price-earnings *480 ratio would drop. Our Ultimate Finding as to the value of the Food Town restricted stock on the disputed dates reflects our judgment as to the weight to be given these and other factors in arriving at the amount of the allowable discount. Petitioner argues that the value of the Food Town restricted stock should be estimated by reference to the Stroupe's Market assets sold to Food Town. The sales agreement of April 20, 1971, provided that the 17,500 shares of its restricted stock "for the purposes of this Agreement" had a value of $150,000 or about $8.57 per share. Petitioner reasons that this $150,000 reflects the judgment of the parties as to the value of what Stroupe's Market gave up in order to acquire the stock.Under the so-called barter-equation valuation method, petitioner argues that the value of what Stroupe's Market gave up should be taken as the value of the restricted stock so acquired. In May 1971, when the stock sale transaction was closed, the over-the-counter price of Food Town stock was about $20.50 per share. Petitioner argues that che agreed value (about $8.57 per share) of the "goods, wares, and merchandise" given up by Stroupe's Market thus reflects a discount *481 of over 60 percent from the over-the-counter price. Petitioner would apply this 60-percent discount to the over-the-counter prices on the crucial dates in arriving at the proper values. The obvious weakness in this argument is that Stroupe's Market gave up more than the "goods, wares, and merchandise" referred to in the agreement. Stroupe's Market was a going concern with a prosperous business, a staff of experienced employees, and substantial goodwill reflected by customers accustomed to shopping in its store. The contract called for Food Town to be given a 10-year lease of the store building in which Stroupe's Market's business had been conducted. We do not think the "value" stated in the April 20, 1971, agreement has any substantial relationship to the value of the Food Town restricted stock as of December 23, 1971, and January 10, 1972. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
1. /↩ The "other assets" are stated at cost. Among such assets were Food Town's investment in Bi-Lo, Inc., Greenville, S.C., which, Food Town's 1972 annual report states, had a market value of $2,060,250.
1. /↩ Incomplete.
1. /↩ Incomplete.
2. / Petitioners contend that the difference between these values and the values determined in the notice of deficiency ( $36 per share on Dec. 23, 1971, and $32 per share on Jan. 10, 1972), shows that respondent's determination was arbitrary and excessive and relieves petitioners of their normal burden of proof. There is no merit in this contention. Mensik v. Commissioner,37 T.C. 703, 723-725 (1962), affd. 328 F.2d 147 (7th Cir. 1964), cert. denied 379 U.S. 827↩ (1964).