Frank G. Templeton and Helen M. Templeton,
Petitioners *v.* Commissioner of
Internal Revenue, Respondent

Docket No. 216–74. Filed December 21, 1976.

*J. Randall Groves* and *J. Michael Booe,* for the petitioners.
*Eric B. Jorgensen,* for the respondent.

### SUPPLEMENTAL OPINION

Simpson, *Judge:* After entry of the decision in *Frank G. Templeton,* 66 T.C. 509 (1976), the petitioners filed a motion to vacate and revise decision and a motion for reconsideration of opinion. In such motions, they claimed that two paragraphs of the stipulation of facts had been misunderstood and that, as a consequence, the result in that case was erroneous. The Commissioner filed his objections to both motions and requested that the parties be allowed to file a supplemental stipulation of facts. This Court authorized the filing of a supplemental stipulation of facts and supplemental briefs, and the parties have since filed them.

The issue in the prior *Templeton* case was whether the petitioner had complied with the statutory requirements of section 1033 of the Internal Revenue Code of 1954[1] so that he could postpone the recognition of gain with respect to certain property which had been involuntarily converted. We held that the petitioner had failed to prove that when he acquired a controlling interest in TPT,[2] he did so "for the purpose of replacing the property so converted" within the meaning of section 1033(a)(3)(A). In reaching our conclusion, we evaluated all of the circumstances surrounding the acquisition of the stock and the events which occurred shortly thereafter. Based

---

[1] All statutory references are to the Internal Revenue Code of 1954.

[2] In this opinion, we shall use the same references as in the prior opinion.

on the stipulation of facts, we concluded that shortly after the petitioner transferred condemnation proceeds of $300,000 to TPT and acquired a controlling interest therein, he and his children received from TPT more than $123,000 of such funds. In their supplemental stipulation of facts, the parties now agree that the petitioner and his family did not receive such payments at such times from TPT. In the interest of justice, we have decided to modify the facts in the case and to reconsider our opinion in the light of such revised facts.

Most of the facts set forth in our prior opinion remain unchanged. However, in the supplemental stipulation of facts, the parties have agreed to the modification of some facts and to some additional facts. The modified and supplemental facts are as follows:

On February 17, 1970, the petitioners sold two lots and a rental framehouse thereon (the McClintock property) to TPT in exchange for TPT's assumption of a mortgage on such property in the amount of $14,976.75, plus its promise to pay the petitioners $5,023.25. In 1970, TPT did not make such payment to the petitioners, but its books and records did reflect such liability.

On or about March 31, 1970, the petitioner, his son, and his daughter sold the Leesona Building and the land on which it was situated to TPT for a price of $118,709. Such price was to be paid by TPT assuming a mortgage of $35,841.69, which was payable to an unrelated person and by issuing checks to the sellers in the amount of $40,422.63, including a check for $27,650.43 to the petitioner. Not more than $31,000 of such funds was from the condemnation proceeds. As a part of such price, TPT also agreed to pay the petitioner $42,444.68. No promissory note was given for such liability, but it was reflected on the books and records of TPT. In 1970, TPT spent $74,650 for capital improvements on the Leesona Building.

In 1970, TPT purchased an unimproved lot on Columbine Circle for $8,624.29, and subsequently, it constructed a house on the lot at a cost of approximately $50,934.41. In 1972, it transferred such property to the petitioner and canceled the indebtedness reflected on its books as owed to the petitioner in the amounts of $42,444.68 from its purchase of the Leesona Building and $16,684.02 arising out of another transaction.

The house is at present the home of Frank G. Templeton, Jr., which he purchased in February 1972.

In 1970, TPT also purchased one piece of improved property for a price of $38,800 and two unimproved tracts for an aggregate purchase price of $59,000. The payments for such purchases were made with the condemnation proceeds which had been transferred to TPT.

On December 22, 1969, TPT entered into an agreement with North Carolina National Bank providing that the bank would act as managing agent of funds to be transferred to it. In part, the agreement stated: "It is the Corporations [sic] desire that you place all or the greater part of these funds in good quality mortgages or bonds since the safety of the principal and the production of good income return are of prime concern to the Corporation." The bank received $321,400 in 1969 for management in accordance with the agreement and immediately invested $321,000 in Ford Motor Creditor Co. revolving notes. During 1970, TPT made substantial withdrawals from the account, and changes were made in the investments, leaving approximately $127,000 invested in debt obligations on November 30, 1970.

The new facts show that a smaller portion of the condemnation proceeds was returned to the petitioner and his family in 1970 than was indicated by the earlier facts, but such change in the facts does not lead to a different conclusion as to the applicability of section 1033. As we said in our earlier opinion:

Obviously, he is entitled to arrange his affairs so as to pay a minimum amount of tax. * * * However, under these circumstances, we must examine carefully the transactions that occurred to ascertain whether, in substance, there has been a compliance with the statutory requirements or whether they are merely designed to create the appearance of conforming to such requirements. * * * In judging these transactions, we must look at all of the events or steps—not merely some isolated events—that occurred in connection with the transfer of the funds to TPT and determine the substance of such transactions in order to decide whether the petitioner entered into them for the purpose of replacing his condemned property. * * * [66 T.C. at 509.]

In other cases in which taxpayers have qualified under section 1033 by acquiring corporate stock, they have either used the condemnation proceeds to purchase from other shareholders the stock of a corporation having similar property or they have formed a corporation which immediate-

ly used the proceeds to acquire similar property. See, e.g., *John Richard Corp.*, 46 T.C. 41, 42, 45 (1966); *Gaynor News Co.*, 22 T.C. 1172, 1174 (1954); *Kimbell-Diamond Milling Co.*, 10 T.C. 7, 8–9 (1948); *The Henderson Overland Co.*, 4 B.T.A. 1088, 1090 (1926). In this case, the petitioner followed neither course. When he transferred $300,000 of the condemnation proceeds and the additional property to TPT, he did augment his ownership interest in the corporation. However, although TPT owned some property similar to that condemned, such property was not its principal asset after the petitioner acquired his controlling interest—its principal assets were the $300,000 and the additional property transferred by him. Under section 1033, a taxpayer's acquisition of stock qualifies only if he thereby acquires control of a corporation whose assets consist principally of similar property not owned by him immediately before the acquisition. Cf. *Gaynor News Co., supra; Kimbell-Diamond Milling Co., supra; The Henderson Overland Co., supra.* In view of TPT's assets after the petitioner acquired control of it in 1969, such acquisition does not qualify under section 1033.

Nor has it been shown that the condemnation proceeds were transferred to TPT for the purpose of immediately acquiring property similar to that condemned. See *John Richard Corp., supra.* Indeed, the new facts show that only a small portion of the funds—$59,000—was used to acquire unimproved real property. The balance of the funds was used for various other purposes. Within 6 months after they were acquired by TPT, $31,000 was returned to the petitioner and his family. Almost $60,000 was used to acquire the Columbine house and lot, which was transferred to the petitioner in 1972. Over $38,000 was used to acquire improved property, which was unlike the property condemned. Finally, substantial investments were made in debt obligations.

There is no evidence that when the petitioner transferred the condemnation proceeds to TPT, he did so for the purpose of acquiring unimproved real property; and the treatment of such proceeds by TPT, of which the petitioner was the dominant shareholder, suggests that the purpose was to diversify and alter the nature of the investment. See *Filippini v. United States*, 318 F.2d 841, 844 (9th Cir. 1963), cert. denied 375 U.S. 922 (1963). In view of these facts, the petitioner has

again failed to carry his burden of proving that when he acquired the stock of TPT, he did so with the requisite purpose. Accordingly, the petitioners' motion for reconsideration of the opinion will be granted, and the motion to vacate the decision will be denied.

*An appropriate order will be issued.*