LESTER HOWARD KAHL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kahl v. Commissioner
Docket No. 868-79.
United States Tax Court
T.C. Memo 1986-240; 1986 Tax Ct. Memo LEXIS 366; 51 T.C.M. (CCH) 1185; T.C.M. (RIA) 86240; June 16, 1986. Joseph L. Wyatt, Jr.,Laura Stern Seaver, and James R. McDaniel, for the petitioner. Karl D. Zufelt, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Year
Deficiency
1972
$2,088.72
1973
1,189,864.53
1975
121,191.19
*367 After concessions, the issues for decision are whether petitioner reinvested proceeds of an involuntary conversion in property entitling him to nonrecognition of gain under section 1033 [1] and whether petitioner sustained a deductible theft loss in 1975. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Hemet, California, when he filed his petition in this case. He filed Federal income tax returns for the taxable years 1972, 1973, and 1975. The Tucson Property
In 1969, petitioner learned that the State of Arizona and the City of Tucson, Arizona, were threatening to condemn a 350 acre parcel of real property held by him for investment and located in Tucson, Arizona (the Tucson Property). On April 1, 1973, petitioner sold the Tucson Property under the threat of condemnation for $3,750,000. Between February 1971 and January 1972, petitioner purchased in his name and for investment parcels of *368 real property in the United States for a total cost of $118,458.86. Costa Rican Activities
Formation of IPSA
In 1974, petitioner contacted the Consul General of Costa Rica in Los Angeles, California, and requested guidance in purchasing real property in Costa Rica. It was recommended that petitioner engage the assistance of Sr. Carlos Loria (Loria), a Costa Rican attorney and cousin of the Consul.The Consul notified Loria that petitioner would contact him. In February or March 1974, petitioner and his brother traveled to Costa Rica and met with Loria. There, they discussed petitioner's desire to use proceeds from the sale of the Tucson Property to purchase real property in Costa Rica. Petitioner explained that he would not return to Costa Rica until later in 1974. Although petitioner intended to make the investments in his own name, Loria advised him that a Costa Rican corporation would be necessary for petitioner to invest in Costa Rican properties and that petitioner should make Loria an officer of the corporation to enable Loria to act on petitioner's behalf in making the investments. Also, Loria told petitioner that he could invest petitioner's funds in *369 short-term construction loans in Costa Rica until the funds were needed for anticipated real estate investments in late 1975. Petitioner was receptive to the idea. Shortly thereafter, he returned to Arizona. In March 1974, Loria arranged for the formation of a Costa Rican corporation by the name of Inversiones Para El Progreso Sociedad Anonima (IPSA). As explained by Loria to petitioner, petitioner would own 100 percent of the stock, petitioner would be president, petitioner's brother would be vice-president, and Loria would be secretary. Also, Loria would have full authority to act for IPSA, to control its assets, and to write checks on its bank accounts. Only ten shares of bearer stock were issued, and at least one stock certificate dated March 14, 1974, included petitioner's signature on a line marked "President." Shortly after IPSA was formed and unbeknownst to petitioner, Loria formed three other corporations, Trimiran, S.A., Den Haag, S.A., and Finca Alsina, S.A. The ownership of these corporations was also in the form of bearer stock. In December 1974, petitioner returned to Costa Rica. He purchased a new vehicle, a Range Rover, and opened two IPSA bank accounts *370 with Banco Anglo Costarricense. One account would be maintained in Costa Rican colones and the other account would be maintained in United States dollars (Banco Anglo Colones Account and Banco Anglo Dollar Account, respectively, and Banco Anglo Accounts, collectively). At all relevant times in 1974, 1975, and 1976, the official exchange rate for Costa Rican colones was 8.54 colones for 1 dollar. The following table summarizes petitioner's deposits in the Banco Anglo Accounts through December 31, 1975: Deposits to Banco
Anglo Dollar Account
Date
Dollar Amount
Colones Equivalent
Dec. 23, 1974
$ 350.00
" 2,989.00
Jan. 3, 1975
450,000.00
3,843,000.00
Apr. 1, 1975
1,808,000.00
15,440,320.00
Nov. 14, 1975
170,000.00
1,451,800.00
Total
$2,428,350.00
"20,738,109.00
Deposits to Banco
Anglo Colones Account
Date
Colones Amount
Dollar Equivalent
Dec. 19, 1974
"251,000.00
$29,391.10
Dec. 23, 1974
147,009.08
17,214.18
Total
"398,009.08
$46,605.28
The total of these deposits, some of which were wired from the United States, was $2,474,955.28. From December 19, 1974, until July 23, 1975, only Loria wrote *371 checks on the Banco Anglo Accounts. Loria Purchases
In December 1974, petitioner and Loria arranged for IPSA to purchase a parcel of property known as Finca La Macha (Finca). Loria told petitioner that the purchase price was $175,000, with $75,000 to be withheld pending the seller's fulfillment of certain obligations. Loria completed the purchase on January 15, 1975. The deed was in Spanish and designated IPSA as the purchaser. It reflected a total cost of $110,000; however, Loria withdrew $182,000 from the Banco Anglo Dollar Account (January 17, 1975) and subsequently deposited $69,018.50 in the Banco Anglo Colones Account (January 20, 1975). In May 1975, Loria purchased for IPSA certain real property including a house and an adjoining parcel of undeveloped property. The check used to purchase the house was drawn on a bank account belonging to Trimiran, S.A.; however, title was taken in IPSA's name. The total cost of the house and undeveloped land was $59,499.81. Loria gave petitioner a deed describing, in Spanish, only a portion of the property purchased. That property was sold on December 20, 1976, in exchange for cash and improved property which included a *372 residence since used by IPSA as rental property. Loria Loans
Regarding the loans to be arranged by Loria, petitioner was told in January 1975 that the interest would be approximately 30 percent and that all attorneys' fees would be paid by the borrowers. Subsequently, a number of loans were made by Loria with IPSA funds in March and April 1975. All of these loans matured in 1976, exactly 1 year from their respective dates of execution. The total of the principal amounts due on the loans was $317,915.69, and each note stated its total amount payable to IPSA upon maturity.Interest varied between 18 and 24 percent, and Loria's commission was 5 percent per loan. Both the interest and Loria's commission were deducted from the amount actually transferred to a borrower when his loan was made. Investigation of Loria
Petitioner returned to Costa Rica in June 1975. He then discovered that his Range Rover, which was left in Loria's care, had been subject to substantial use and damage; further, many parts on the vehicle had been exchanged for worn replacements. As a result, petitioner became suspicious of Loria's management of the funds petitioner had transferred to *373 the IPSA bank accounts. Petitioner asked Loria the status of those funds, but Loria avoided meeting with petitioner. After several weeks, Loria informed petitioner that he (Loria) would provide no information, would return no money, and could beat petitioner in court. In July 1975, after reviewing financial statements prepared by an accountant, petitioner conducted his own investigation of Loria's transactions. As a result of this investigation, petitioner discovered (1) transfers of funds from the Banco Anglo Dollar Account to the Banco Anglo Colones Account; (2) the existence of the three other corporations formed by Loria: Trimiran, S.A., Den Haag, S.A., and Finca Alsina, S.A.; (3) transfers of funds totaling $1,296,491.14 from IPSA to Trimiran, S.A. in April and May 1975; and (4) many short-term loans executed by the three other corporations between March and July 1975. The total face amount of these loans was $1,174,473.05, including loans due in 1975 with a face amount of $70,257.60. Petitioner hired a Costa Rican attorney, Carballo, to assist in obtaining a proper accounting from Loria. After meeting with Loria, Carballo advised petitioner that Loria was willing to turn *374 over to petitioner the bearer stock in all four corporations. Petitioner agreed to accept the stock but only to mitigate his damages, and Loria signed a written statement to that effect. Carballo also persuaded Loria to return certain funds to IPSA. Accordingly, in or about July and August 1975, Loria deposited a total of $715,137.92 in the Banco Anglo Colones Account and delivered to petitioner, for the first time, all of the bearer stock to the four corporations, IPSA, Trimiran, S.A., Den Haag, S.A., and Finca Alsina, S.A. In July 1975, petitioner fired Loria as his attorney and property manager. The minute book for IPSA included the following entries: The first entry, dated December 17, 1974, described Loria and another individual, Osborne, as the owners of all the IPSA stock and described Loria as secretary; the second entry, also dated December 17, 1974, described the resignation of the president (unnamed) and described Osborne as the new president; the third entry, dated December 18, 1974, stated that all members were present at a meeting that date and that the prior appointment of Osborne as president was nullified in ivew of the transfer of stock to petitioner. None *375 of those entries indicate petitioner's presence or approval, and the next recorded shareholders' meeting was not until August 18, 1975. The entry recorded on that date described petitioner as present and in possession of the IPSA stock and described Loria's resignation. Kanes
In late July 1975, petitioner retained the services of Levi Kanes (Kanes) to continue with petitioner's plan to reinvest the proceeds remaining from the sale of the Tucson Property in Costa Rican properties. Kanes was made an officer of IPSA with unlimited authority. Kanes opened an IPSA bank account at Banco de Costa Rica in which petitioner deposited 4,500,000 colones (from the funds returned by Loria). In November 1975, petitioner also deposited $170,000.00 in the Banco Anglo Dollar Account. Subsequently, petitioner or Kanes purchased for IPSA certain parcels of real property. The dates and prices of these purchases were as follows: Purchase
Purchasing
Date
Price
Agent
August 22, 1975
376,212 colones
Petitioner
($44,052.93)
September 1975
251,345 colones
Petitioner
($29,431.50)
November 4, 1975
$250,000
Kanes
Late 1975
$5,035.13
Petitioner
Late 1975
500,000 colones
Petitioner
($58,548)
*376 The total cost of these purchases was $387,067.56.For each purchase, title was taken in IPSA's name, and each deed was written in Spanish. As with Loria, petitioner began to suspect Kanes of misappropriating IPSA funds. As a result of an investigation commenced in late 1975 but on uncertain dates, petitioner discovered that Kanes had been selling cattle and keeping the money, had been writing checks on the IPSA bank account payable to himself, and had borrowed against a $526,932 (4,500,000 colones) Certificate of Deposit held by IPSA for 100 percent of its value. Some time after January 1976, petitioner removed Kanes as an officer of IPSA. Additional Recovery Efforts
Petitioner and his attorney, Carballo, attempted to recover the funds that had been loaned by Loria, and between 1976 and 1978, they foreclosed on property securing four of the loans. In December 1976 petitioner brought suits in Costa Rica against Loria and Kanes. The suit against Loria was dismissed in February 1977, and Loria filed a countersuit against petitioner. Because Kanes left Costa Rica and was not subjected to jurisdiction in its courts, the suit against him was pending at the time *377 of the trial of this case in 1985. Notice of Deficiency
On his 1973 tax return, petitioner reported an election to postpone tax on the gain of $3,686,231.08 resulting from the sale in 1973 of the Tucson Property, with the intent to purchase replacement property qualifying for nonrecognition of gain. On schedule C of his 1975 tax return, petitioner reported, without further explanation, "Losses incurred in Costa Rica by misappropriation of funds by agents" in the amount of $1,676,475.96. In December 1976, petitioner filed an amended 1973 tax return to report the gain on the sale of the Tucson Property and the nonrecognition of a portion of that gain to the extent he purchased claimed replacement properties in the amount of $817,214.53. Petitioner included in the amended return a statement requesting that the assessment of his resulting 1973 tax be abated until a determination was reached regarding his application for a 1975 net operating loss (NOL) and carryback. That application was made on a Form 1045, Application for Tentative Refund, filed with petitioner's amended 1973 return or shortly thereafter. Therein, petitioner reported his NOL for 1975 of $1,476,471.12 and *378 the carryback of that NOL to 1973 and to 1972 for a reduction in his tax liability in each of those years. In his notice of deficiency, respondent disallowed a portion of the nonrecognition of gain claimed by petitioner in his amended 1973 tax return on the ground that petitioner had not established that he acquired more than $5,528.60 of replacement property. Respondent also disallowed the claimed 1975 NOL and the carryback of that NOL to taxable years 1973 and 1972 on the ground that petitioner had not established that the alleged Costa Rican loss reported on Schedule C of petitioner's 1975 tax return was an ordinary and necessary business expense or that it was expended for the purpose so designated. OPINION Replacement Property
Respondent concedes in his brief that petitioner is entitled to nonrecognition of gain under section 1033 to the extent of the United States properties purchased by petitioner for the purpose of replacing the Tucson property, which he sold in 1973 under the threat of condemnation. What remains for our determination is whether petitioner is also entitled to nonrecognition of gain under section 1033 to the extent of the Costa Rican properties *379 purchased in 1974 and 1975 by IPSA, petitioner's newly formed Costa Rican corporation. Section 1033 provides in pertinent part as follows: SEC. 1033. INVOLUNTARY CONVERSIONS. (a) General Rule.--If property (as a result of its * * * condemnation or threat or imminence thereof) is compulsorily or involuntarily converted-- * * * (3) Conversion into money where disposition occurred after 1950.--Into money * * * the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of gain.--If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion * * * exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * * [Emphasis supplied. *380 ] Respondent does not contest the validity or timeliness of petitioner's election under section 1033 or the timeliness of the Costa Rican purchases under section 1033(a)(3)(B). Also, respondent concedes in his brief that the Costa Rican properties were similar or related in service or use to the Tucson property. Respondent argues, however, that the Costa Rican properties do not qualify under section 1033 because they were purchased by petitioner's corporation, IPSA, and not by petitioner. See Hill v. Commissioner,66 T.C. 701, 704 (1976); and Feinberg v. Commissioner,45 T.C. 635, 639 (1966), affd. 377 F.2d 21 (8th Cir. 1967). Petitioner argues that his use of a corporation qualifies under section 1033 as construed by this Court in John Richard Corp. v. Commissioner,46 T.C. 41 (1966). Alternatively, petitioner argues that the corporation, IPSA, should be disregarded because petitioner was misled by his Costa Rican attorney to believe that the corporation was necessary to make any purchases of Costa Rican property and that therefore he should be treated as the purchaser of the replacement property. In John Richard Corp. v. Commissioner,supra, *381 we held that the taxpayer's purchase of controlling stock in a new corporation that subsequently purchased replacement property "was the purchase of stock 'in the acquisition of control of a corporation owning' similar property within the meaning of the statute." 46 T.C. at 45. In that case, the taxpayer corporation's wool-processing plant was destroyed, and for business reasons, the taxpayer created a new corporation for the purpose of purchasing and operating a new wool-processing plant. The taxpayer purchased 99 percent of the new corporation's stock, and, shortly thereafter, the new corporation acquired a mill, thereby resuming the wool-processing business previously conducted. We found that the new plant was similar to the prior plant. Thus, the sole remaining issue was whether the taxpayer's purchase of controlling stock in a newly formed corporation that subsequently acquired similar property qualified the taxpayer for nonrecognition of gain under section 1033. Respondent's primary argument in John Richard Corp. was that section 1033, applied literally, did not extend to the taxpayer because the new corporation did not own the replacement property at *382 the time the taxpayer acquired its controlling stock interest. On those facts, however, we applied a liberal construction of section 1033 and concluded for the following reasons that it was immaterial that the mill was acquired after the taxpayer purchased the stock: The entire transaction, including the location of and negotiations for the new mill occurred within a period of 1 month. The acquisition of the stock and the purchase of the mill occurred within a few hours, if not actually at the same time and place. Petitioner's purchase of the stock and the acquisition of the mill by Peterborough Mills were separated in point of time only so far as was required by business practicalities. Any distinction in the application of the statute under these circumstances and in the case of a purchase of stock in a corporation which previously owned the property is too technical to be justified and would fail to give effect to the statutory purpose to allow tax-free replacement of involuntarily converted property through the purchase of other property or stock. [46 T.C. at 47.] Thus, because the organization of the new corporation, the acquisition of its stock, and *383 the purchase of the mill were "merely steps in an integrated transaction having for its purpose the replacement of petitioner's involuntarily converted property," we held that the taxpayer was entitled to nonrecognition of gain under section 1033(a)(3)(A). 46 T.C. at 47. See also Cliftoin Investment Co. v. Commissioner,36 T.C. 569, 573 (1961), affd. 312 F.2d 719 (6th Cir. 1963). Petitioner argues that the facts here compel a similar conclusion to that in John Richard Corp. v. Commissioner,supra, i.e., that the formation and use of IPSA was merely an integral step in petitioner's plan to reinvest condemnation proceeds in replacement property. Although petitioner's intent in forming IPSA may have been similar to the taxpayer's intent in forming a new corporation in John Richard Corp., other facts distinguish this case from John Richard Corp.
In John Richard Corp., the taxpayer's newly formed corporation purchased only similar property. Other cases, where stock purchases were held to qualify under section 1033, do not indicate that the acquired corporations owned any property other than similar property. *384 See, generally, Broadview Lumber Co. v. Commissioner,561 F.2d 698 (7th Cir. 1977); Gaynor News Co. v. Commissioner,22 T.C. 1172 (1954); Kimbell-Diamond Milling Co. v. Commissioner,10 T.C. 7 (1948). Where a corporation's principal assets were not similar property, a stock purchase did not qualify under section 1033, even though some of the assets were similar. Templeton v. Commissioner,66 T.C. 509 (1976), supplemental opinion 67 T.C. 518 (1976), affd. per curiam 573 F.2d 866 (4th Cir. 1978). In Templeton, we stated that a stock purchase would not qualify unless the corporation's "assets consist principally of similar property." 67 T.C. at 521. Here, petitioner may have originally intended that IPSA acquire assets consisting principally of similar property, but that is not what transpired. In 1974 and 1975, petitioner transferred to IPSA proceeds exceeding $2.4 million, yet less than 25 percent of those funds were expended in purchasing similar property. Most of the remaining funds were invested in short term lending operations conducted by IPSA and other corporations *385 organized by petitioner's agent, Loria. Thus, because the proceeds advanced to IPSA were not invested in assets consisting principally of similar property, we conclude that petitioner did not purchase stock in the acquisition of control of a corporation owning similar property within the meaning of section 1033. Petitioner argues that if we do not apply John Richard Corp., he should be treated as the owner of the property and should qualify under section 1033 as having purchased similar property himself. Petitioner contends that IPSA should be disregarded because it was used by Loria and Kanes to perpetrate a fraud against him. To support this argument, petitioner cites certain cases for the proposition that State law ignores corporate form if that form sanctions fraud or promotes injustice. Employer's Liability Assurance Corp. v. Lunt,82 Ariz. 320, 313 P.2d 393, 395-396 (1957); Stark v. Coker,20 Cal. 2d 839, 129 P.2d 390, 394-395 (1942). As respondent correctly points out, however, these cases are distinguishable. They applied the equitable "alter ego doctrine" to enable third party creditors to pierce the corporate veil and hold the *386 owners of the respective corporations personally liable. Petitioner argues that this equitable theory may also be extended for the benefit of stockholders. Conway v. Citrus Belt Land Co.,94 Cal. App. 533, 538, 271 P. 525 (1928). Conway, however, was not a tax related dispute and only recognized that the equitable doctrine may apply "where the rights of stockholders among themselves were presented for the consideration of the court." 271 P. at 527. Emphasis supplied. Corporate form will not be disregarded to facilitate tax avoidance. Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943). See also Western States Bankcard Associations v. San Francisco,19 Cal.3d 208, 561 P.2d 273 (1977). "[I]n matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal." Moline Properties, Inc. v. Commissioner,319 U.S. at 439. Petitioner, however, has not proven such circumstances. IPSA conducted more than one business activity, had corporate officers, maintained records and bank accounts separate from and independent of petitioner, and, as in Moline Properties, *387 Inc., petitioner's control, during most of the period in issue, over specific corporate activities was negligible. Furthermore, petitioner had the opportunity to take "corrective" action but did not do so. For instance, petitioner testified that he believed the corporation was buying property in his name, yet even after removing his first agent Loria, he purchased property for IPSA in IPSA's name. Also, before the section 1033(a)(3)(B) period had expired, petitioner was aware that a substantial portion of the funds had not been spent on similar property; yet, petitioner took no course of action to conform the purchases to the requirements of section 1033. Petitioner cannot simply pick and choose corporate iterms to be reported on his individual tax return. Thus, petitioner is not entitled to nonrecognition of gain on the sale of the Tucson Property to the extent that proceeds were reinvested by or through IPSA. Theft Loss
Section 165 allows a deduction for loss from theft discovered during the taxable year to the extent that such loss exceeds $100 and is not reimbursed by insurance or otherwise. To be allowable as a deduction, the loss must be bona fide, evidenced *388 by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year. Section 1.165-1(b), Income Tax Regs. Petitioner bears the burden of proving that he is entitled to the claimed theft loss deduction. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner argues that he incurred a deductible theft loss of $1,676,475.96 in 1975 as a result of the fraudulent misappropriation of funds by Loria and Kanes. Petitioner alleges that he owned the property at the time of the loss, the loss constituted a theft under applicable State and Federal law, [2] the loss was discovered in 1975, and there was no reasonable prospect for additional recovery of property. In his reply brief, petitioner computes his theft loss attributable to Loria as follows: Item
Value
Real property purchased for IPSA
$169,500.00 Loans
168,029.86 Loria payment
715,137.00 IPSA Banco Anglo Dollar Account
18,094.00 IPSA Banco Anglo Colones Account
178.00 Trimiran Bank Account
Total Value fo recovered property
1,070,938.86 Amount transferred to Costa Rica
(2,304,955.00)
Loss as of 7-31-75
(1,234,016.04)
*389 Petitioner then states categorically that the balance of the total loss claimed on his tax return was attributable to Kanes. [3]
*390 After carefully examining the evidence, [4] we conclude that petitioner has failed to prove that he incurred a deductible theft loss in 1975. As explained in more detail below, petitioner failed to establish that he owned the property allegedly stolen, that he discovered in 1975 the alleged losses related to Kanes, that the amount of any loss was not "otherwise" compensated, and that no reasonable prospect of recovery existed at the end of 1975. A theft loss deduction may be claimed only by the taxpayer who owned the property at the time it was taken. Mannette v. Commissioner,69 T.C. 990, 994 (1978); Rink v. Commissioner,51 T.C. 746, 753 (1969). [5] Respondent argues that IPSA was the owner of the property at the time it was allegedly stolen and that therefore any deductible theft loss was IPSA's not petitioner's. Petitioner claims that he is nevertheless entitled to the alleged theft loss deduction under the rule developed in Vietzke v. Commissioner,37 T.C. 504 (1961), *391 wherein we held that the individual taxpayer could claim a loss for money advanced to a corporation and subsequently stolen. In that case, a life insurance corporation was being organized by two individuals when the taxpayer was enticed to invest in the venture. The taxpayer advanced a total of $25,000 for stock subscriptions. The money was placed in a trust account and subsequently used for personal expenses of the two organizers. We determined that the corporate entity was merely a device used to swindle subscribers, and the corporation never reached the level of operating an insurance business, its intended purpose. Respondent argues that Vietzke is distinguishable from the facts herein.We agree. Although IPSA was formed only upon Loria's recomnendation, it nevertheless operated as a vehicle for making loans and purchasing property. Petitioner signed organizational documents; he granted Loria and later Kanes broad control over assets and funds; and he transferred substantial sums of money to IPSA. Although there may indeed have been the mishandling and misappropriation of funds, IPSA was not merely a swindler's "device," as was the case in Vietzke.[6]
*392 Petitioner also argues that State law ignores corporate form if that form sanctions fraud or promotes injustice. Employer's Liability Assurance Corp. v. Lunt,82 Ariz. 320, 313 P.2d 393, 396 (1957); Stark v. Coker,20 Cal. 2d 839, 129 P.2d 390 (1942). We have already addressed this contention with regard to petitioner's replacement property, and as we stated there, petitioner has not satisfied us that, in view of petitioner's facts, the corporate form should be disregarded. A theft loss may be claimed only in the year in which it is discovered. Section 165(e); section 1.165-1(d)(1), Income Tax Regs.; Asphalt Industries, Inc. v. Commissioner,411 F.2d 13 (3d Cir. 1969), affg. a Memorandum Opinion of this Court. The evidence shows that petitioner discovered mishandling of IPSA's funds by Loria in 1975; petitioner became suspicious, conducted an investigation, and fired Loria in or about July 1975. Petitioner has not proven, however, that he made such a discovery in 1975 with regard to Kanes. The record indicates that (1) Kanes was hired in July 1975, (2) an investigation was commenced in late 1975, (3) funds were transferred *393 to the Banco Anglo Accounts in November 1975, (4) Kanes continued to write checks on IPSA accounts in 1976, and (5) Kanes was fired after January 1976. Petitioner concedes on brief that at least some of Kanes' acts were not discovered in 1975; however, he offers no substantiation as to what was discovered in 1975 and what was discovered in 1976. Had petitioner discovered a theft in 1975, it is doubtful that he would have continued Kanes' services until after January 1976. Petitioner has failed to prove any discovery in 1975 of theft by Kanes. Section 165(a) allows a deduction only for a loss "not compensated for by insurance or otherwise." Based on our examination of the record, we conclude that petitioner has also failed to prove that he sustained a loss in 1975 net of the amounts reimbursed by Loria. Petitioner recovered from Loria the bearer stock in the four corporations and cash of $715,137. Although petitioner recognizes this in his reply brief, his calculation of the amounts reimbursed used an unreasonably small value for the short-term loans, which had a face amount totaling almost 10 times the value asserted by petitioner. Finally, petitioner has failed to prove that *394 there was not at the end of 1975 a reasonable prospect for recovery of any loss sustained by him. Section 1.165-1(d)(2)(i) provides as follows: (2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received in sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. * * * "A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will bef decided in his favor." Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975), and cases cited therein. This determination requires *395 an objective analysis of the reasonable expectations that existed at the close of the taxable year. Ramsay Scarlett & Co.,supra at 811. At the close of 1975, petitioner had only begun his investigation of Kanes, had not yet discovered any Kanes-related misappropriations, and still employed Kanes. Petitioner discovered Loria's misappropriations and fired Loria in 1975. Loria, however, gave petitioner the bearer stock of the corporations and $715,137.92 in 1975. The corporations continued to hold the property purchased as well as the short-term notes, most of which were due in 1976. Even if petitioner had not recovered by the end of 1975 all of his loss attributable to Loria, he has not proven that there was no reasonable prospect of recovery. For all of the above reasons, respondent's disallowance of the theft loss deduction must be sustained. Because of concessions by the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. A taxpayer must establish that an alleged loss constitutes a theft under applicable local law. Paine v. Commissioner,63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975). Although the parties dispute which jurisdiction applies, they agree that the laws of the jurisdictions they each seek to apply are similar in defining theft. See for instance Ariz.Rev. Stat. Ann. sections 13-681, 13-682 (repealed 1978); Cal. Penal Code sections 484, 503↩ (West 1970); Costa Rican Penal Code, Title VII, sec. IV, art. 216 (1975). 3. First, petitioner, in his 1975 tax return, reports a loss of $1,676,475.96, without any explanation. Second, petitioner, in his opening brief, clculates the alleged loss as the difference between the total funds transferred to Costa Rica in 1975 ($2,474,955.28) and the "value" of the property recovered ($734,375.67), which petitioner asserted was composed of (1) Loria purchases of $169,499.81, (2) Kanes purchases of $387,067.56, (3) bank balances of $9,778.44, and (4) Loria's loans "valued" at $168,029.86. Third, petitioner, in his reply brief, calculates the alleged loss as set forth in the text above. No reconciliation is attempted.↩
4. Of the 63 exhibits admitted into evidence, 43 were written in Spanish, and no English translation was provided.↩
5. See also Jensen v. Commissioner,T.C. Memo. 1979-379↩.
6. See Silverman v. Commissioner,T.C. Memo. 1975-255, affd. without published opinion 538 F.2d 320↩ (3d Cir. 1976).